UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

NOVARTIS PHARMACEUTICALS
CORPORATION,

*Plaintiff,*

v.

GENTNER DRUMMOND, in his official
capacity as ATTORNEY GENERAL OF
OKLAHOMA,

*Defendant.*

No.  5:25-cv-727-PRW

## THE STATE OF OKLAHOMA'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

GARRY M. GASKINS, II, OBA 20212
 *Solicitor General*
ZACH WEST, OBA 30768
 *Director of Special Litigation*

OFFICE OF ATTORNEY GENERAL
 STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

WILL FLANAGAN, OBA 35110
 *Assistant Solicitor General*
ADDISON GAUT, OBA 36457
 *Assistant Attorney General*

OFFICE OF ATTORNEY GENERAL
 STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
William.Flanagan@oag.ok.gov
Addison.Gaut@oag.ok.gov

*Counsel for Defendant*

August 14, 2025

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ..................................................................................................... 2

    A.  The creation of the 340B Program ..................................................... 2

    B.  HHS guidance letters ......................................................................... 5

    C.  Accounting models for distribution ................................................... 7

    D.  Resulting litigation ............................................................................ 8

    E.  States' responses ............................................................................... 9

    F.  Oklahoma law ................................................................................. 11

    G.  The present lawsuit .......................................................................... 12

ARGUMENT AND AUTHORITIES ................................................................... 12

  I. NOVARTIS CANNOT DEMONSTRATE A LIKELIHOOD OF
    SUCCESS ON THE MERITS. ................................................................... 13

    A. HB 2048 is not preempted. ............................................................ 14

      1. The presumption against preemption applies here. ................. 15

      2. Congress has not preempted the field. ..................................... 16

      3. HB 2048 does not conflict with federal law. ........................... 20

        *a. HB 2048 does not expand the number of eligible 340B patients
        in Oklahoma.* ...................................................................... 23

        *b.  HB 2048's enforcement procedures and remedies do not conflict with federal law.* ....... 27

    B. HB 2048 does not violate the dormant Commerce Clause. ........... 30

      1. HB 2048 is not unlawfully extraterritorial. ............................. 31

      2. HB 2048 does not discriminate against out-of-state commerce. ........... 34

      3. HB 2048 does not excessively burden interstate commerce. ................... 36

  II.  THE OTHER EQUITABLE FACTORS COUNSEL AGAINST
    INJUNCTIVE RELIEF. ............................................................................ 38

  III.  NOVARTIS'S PROPOSED INJUNCTION IS OVERBROAD. .................. 40

CONCLUSION ...................................................................................................... 40

## TABLE OF AUTHORITIES

### Cases

*Abbott v. Perez*,
    585 U.S. 579 (2018)................................................................................................39

*AbbVie Inc. v. Bailey*,
    No. 4:24-cv-996, 2025 WL 1918948 (E.D. Miss. July 11, 2025) ................. 10, 27, 32, 34, 35

*AbbVie Inc. v. Fitch*,
    No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024) .10, 16, 18, 19,
    ....................................................................................................................22, 23, 31, 34

*AbbVie Inc. v. Skrmetti*,
    No. 3:25-CV-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025)...10, 16, 26, 29, 31, 34

*Am. Hosp. Ass'n v. Becerra*,
    596 U.S. 724 (2022)........................................................................................ 4, 16, 37

*Arizona v. United States*,
    567 U.S. 387 (2012)..................................................................................14, 16, 17, 18

*Association for Accessible Medicines v. Ellison*,
    140 F.4th 957 (8th Cir. 2025) ........................................................................................32

*Association for Accessible Medicines v. Frosh*,
    887 F.3d 664 (4th Cir. 2018)................................................................................ 32, 33

*Astra USA, Inc. v. Santa Clara Cnty.*,
    563 U.S. 110 (2011)........................................................................... 3, 18, 19, 27, 28

*AstraZeneca Pharm. LP v. Fitch*,
    766 F. Supp. 3d 657 (S.D. Miss. 2024)................................................................................10

*California v. ARC Am. Corp.*,
    490 U.S. 93 (1989)................................................................................................15

*Chamber of Com. of U.S. v. Whiting*,
    563 U.S. 582 (2011)................................................................................................21

*Cipollone v. Liggett Grp., Inc.*,
    505 U.S. 504 (1992)................................................................................................15

*Citizens for Const. Integrity v. United States*,
    57 F.4th 750 (10th Cir. 2023) ................................................................................................36

*Continental Res., Inc. v. Wolla Oilfield Servs., LLC*,
    510 P.3d 175 (Okla. 2022) ................................................................................................31

*DeCanas v. Bica*,
    424 U.S. 351 (1976)................................................................................................16

*Dep't of Revenue of Ky. v. Davis,*
  553 U.S. 328 (2008) ................................................................................34

*Eli Lilly & Co. v. Kennedy,*
  No. 24-cv-03220, 2025 WL 1423630 (D.D.C. May 15, 2025) ......................7

*Energy & Env't Legal Inst. v. Epel,*
  793 F.3d 1169 (10th Cir. 2015) ........................................................... 30, 33

*Energy Michigan, Inc. v. Michigan Public Service Commission,*
  126 F.4th 476 (6th Cir. 2025) ...................................................................35

*Fent v. Contingency Rev. Bd.,*
  163 P.3d 512 (Okla. 2007) .......................................................................40

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
  373 U.S. 132 (1963) .................................................................................16

*Forest Park II v. Hadley,*
  336 F.3d 724 (8th Cir. 2003) ............................................................... 19, 20

*Free the Nipple–Fort Collins v. City of Fort Collins,*
  916 F.3d 792 (10th Cir. 2019) ..................................................................13

*Geier v. Am. Honda Motor Co.,*
  529 U.S. 861 (2000) .................................................................................21

*General Motors Corporation v. Tracy,*
  519 U.S. 278 (1997) .................................................................................35

*Genesis Health Care, Inc. v. Becerra,*
  701 F. Supp. 3d 312 (D.S.C. 2023) ........................................................ 4, 38

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991) .................................................................................14

*Helfrich v. Blue Cross & Blue Shield Ass'n,*
  804 F.3d 1090 (10th Cir. 2015) ................................................................20

*Hillsborough Cnty. v. Automated Med. Labs., Inc.,*
  471 U.S. 707 (1985) .......................................................................15, 16, 23

*Kansas v. Garcia,*
  589 U.S. 191 (2020)..........................................................16, 17, 21, 30

*Kiobel v. Royal Dutch Petroleum Co.,*
  569 U.S. 108 (2013) .................................................................................31

*KT & G Corp. v. Att'y Gen. of Okla.,*
  535 F.3d 1114 (10th Cir. 2008) ................................................................31

*Lefaivre v. KV Pharm. Co.,*
  636 F.3d 935 (8th Cir. 2011).....................................................................24

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997)................................................................................13

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024)..........................................................................13, 40

*Mount Olivet Cemetery Ass'n v. Salt Lake City,*
    164 F.3d 480 (10th Cir. 1998) ...............................................................15

*Munaf v. Geren,*
    553 U.S. 674 (2008)................................................................................12

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins.,*
    514 U.S. 645 (1995)................................................................................15

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023)...........................................................30, 31, 33, 34, 36, 37

*New Energy Co. of Ind. v. Limbach,*
    486 U.S. 269 (1988)................................................................................34

*Novartis Pharmaceuticals Corp. v. Bailey,*
    No. 2:24-cv-04131, 2025 WL 595189 (W.D. Mo. Feb. 24, 2025) .........................31

*Novartis Pharms. Corp. v. Johnson,*
    No. 21-5299, Doc. 1949831 (D.C. Cir. June 8, 2022) ...............................................9

*Novartis Pharms. Corp. v. Johnson,*
    102 F.4th 452, 456 (D.C. Cir. 2024) ....................................3, 4, 6, 7, 8, 9, 17, 19, 28

*Oneok, Inc., v. Learjet, Inc.,*
    575 U.S. 373 (2015) .........................................................................14, 21

*Parker v. Brown,*
    317 U.S. 341 (1943)................................................................................14

*Paul v. Monts,*
    906 F.2d 1468 (10th Cir. 1990) ..............................................................23

*PCMA v. Wehbi,*
    18 F.4th 956 (8th Cir. 2021) ............................................................16, 24

*Pharm. Rsch. & Mfrs. of Am. v. Bailey,*
    No. 2:24-CV-04144-MDH, 2025 WL 644281 (W.D. Mo. Feb. 27, 2025) .........................10

*Pharm. Rsch. & Mfrs. of Am. v. Fitch,*
    No. 1:24-cv-160-HSO-BWR, 2024 WL 3277365 (S.D. Miss. July 1, 2024).................10, 24

*Pharm. Rsch. & Mfrs. of Am. v. McClain,*
    95 F.4th 1136 (8th Cir. 2024) .........................................10, 16, 18, 20, 21, 23, 24, 25, 26, 27

*Pharm. Rsch. & Mfrs. of Am. v. Morrisey,*
    760 F. Supp. 3d 439 (S.D.W.V. 2024) ................................................10, 26

*Pharm. Rsch. & Mfrs. of Am. v. Murrill*,
No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024)..................10, 19, 22, 24

*Pike v. Bruce Church, Inc.*,
397 U.S. 142 (1970)........................................................................................ 30, 36

*Poe v. Drummond*,
No. 23-5110, 2025 WL 2238038 (10th Cir. Aug. 6, 2025) ....................................13

*Salt Lake Trib. Pub. Co. v. AT&T Corp.*,
320 F.3d 1081 (10th Cir. 2003) ...........................................................................14

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023).........................2, 3, 8, 9, 17, 19, 21, 23, 24, 36

*Sanofi-Aventis U.S., LLC v. HHS*,
570 F. Supp. 3d 129 (D.N.J. 2021) .......................................................................3

*Tarrant Reg'l Water Dist. v. Herrmann*,
656 F.3d 1222 (10th Cir. 2011) ...........................................................................16

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
588 U.S. 504 (2019)...........................................................................................30

*Trump v. CASA, Inc.*,
145 S. Ct. 2540 (2025)........................................................................................40

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
550 U.S. 330 (2007)...........................................................................................30

*United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*,
883 F.2d 886 (10th Cir. 1989) ............................................................................13

*United States v. Hansen*,
599 U.S. 762 (2023)...........................................................................................13

*United States v. Salerno*,
481 U.S. 739 (1987)...........................................................................................13

*US Airways, Inc. v. O'Donnell*,
627 F.3d 1318 (10th Cir. 2010) ...........................................................................17

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)...............................................................................................13

*Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*,
475 U.S. 282 (1986)...........................................................................................29

*Wyeth v. Levine*,
555 U.S. 555 (2009)...........................................................................................24

## Statutes and Constitutional Provisions

U.S. Const. art. VI, cl. 2........................................................................................14

42 U.S.C. § 1396r-8 ..............................................................................................3

42 U.S.C. § 256b ...................................... 3, 4, 5, 8, 17, 21, 23, 24, 25, 26, 28, 29, 33

Ark. Code § 23-92-601 *et seq.* ...........................................................................10

Colo. R.S. § 6-29-101 *et seq.* .............................................................................10

Haw. H.B. 712 (2025) ..........................................................................................10

Kan. Stat. § 65-483 ..............................................................................................10

La. Rev. Stat. § 40:2883 ......................................................................................10

Me. L.D. 210 pt. P (2025) ....................................................................................10

Md. H.B. 1056 (2024) ..........................................................................................10

Minn. H.F. 4991 (2024) .......................................................................................10

Miss. Code § 75-24-5 ...........................................................................................10

Mo. S.B. 751 (2024) ............................................................................................10

Neb. L.B. 168, § 3(1) (2025) ................................................................................10

N.M. H.B. 78 (2025) ............................................................................................10

N.D. Cent. Code § 43-15.3-08 .............................................................................10

Okla. Stat. tit. 36, § 5401 *et seq.* ................................. 11, 12, 18, 22, 24, 25, 30, 32, 40

Or. H.B. 2385 (2025) ...........................................................................................10

R.I. S.0114 (2025) ...............................................................................................10

S.D. S.B. 154 (2025) ...........................................................................................10

Tenn. S.B. 1414 (2025) ........................................................................................10

Utah Code § 31A-46-311 ......................................................................................10

Vt. H.266 (2025) ..................................................................................................10

W. Va. Code § 60A-8-6a .......................................................................................10

**Other Authorities**

340B Drug Pricing Program—Contract Pharmacy Services,
75 Fed. Reg. 10,272 (Mar. 5, 2010) ................................................................7

340B Informed, *Keeping Rural Hospitals Open is a Key Part of 340B*
(Mar. 7, 2019) ...............................................................................................4

Alaa Ziad Haidar, *Recent 340b Contract Pharmacy Troubles and the Necessary Solution,*
33 Health Law. 34 (2020) ............................................................................39

Cytovance Biologics, https://cytovance.com/ (last visited Aug. 14, 2025).....................34

GOV'T ACCOUNTABILITY OFF., *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 17–18 (GAO-11-836, Sept. 2011) ................................................................................. 4

Joel M. Hamme *et al.*, 2 HEALTH L. PRAC. GUIDE § 26A:20 (2024) ...................................................... 8

Nicholas C. Fisher, *The 340B Program: A Federal Program in Desperate Need of Revision After Two-and-a-Half Decades of Uncertainty*, 22 J. HEALTH CARE L. & POL'Y 25 (2019) ............................................................. 2

PHARMCHOICES, *Full List of Pharm. Companies in Oklahoma (2024)*, https://pharmchoices.com/biotech-pharmaceutical-companies-in-oklahoma/ (last visited Aug. 14, 2025) .................................................................................................. 34

Veterans Health Care Act of 1992 Entity Guidelines, 59 Fed. Reg. 25,110 (May 13, 1994) ......................................................... 6

Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549 (Aug. 23, 1996) ("1996 Guidance") ............................... 6, 9, 17

## **INTRODUCTION**

As a condition for participating in Medicare Part B and Medicaid, the 340B Drug Pricing Program ("340B Program" or "Program") requires drug manufacturers to provide a discount to certain healthcare providers. Many of those covered healthcare entities choose to contract with pharmacies to provide patients with prescription medication. Under the terms of those contracts, the covered entities can receive the Program discount for prescriptions filled in the contracted pharmacies. Recently, however, manufacturers have begun to restrict the number of contracted pharmacies where patients can receive 340B discounted drugs. Numerous states have pushed back. The Oklahoma Legislature enacted House Bill 2048 ("HB 2048"), which prohibits manufacturers from limiting covered entities in Oklahoma from contracting with outside pharmacies to provide their patients with 340B discounted drugs.

With the enactment of HB 2048, Novartis Pharmaceuticals Corporation ("Novartis") and its fellow drug manufacturers have lost a policy debate. Now, Novartis asks this court to step in and override the democratic process. Although the administration of healthcare services and prescription medication is complex, the core of this case is simple. Both parties agree that the federal statute governing the 340B Program is completely silent as to the delivery of 340B discounted drugs. Because federal law is silent, Oklahoma's regulation of *where* manufacturers must deliver 340B drugs is not preempted, as numerous courts have found. Similarly, HB 2048 does not violate the dormant Commerce Clause because it merely regulates the *delivery* of a product and does not discriminate against interstate commerce. In the end, this Court should deny Novartis's effort to block enforcement of a state law that will help Oklahoma's underserved citizens obtain vital health care services and prescription drugs.

1

## BACKGROUND

### A. The creation of the 340B Program

The federal government and the states have taken many steps to ensure that the nation's most vulnerable citizens can access the healthcare and prescription drugs that they need to live healthy lives. The federal government has done this largely by leveraging its immense market power in healthcare. As an illustration, Medicare and Medicaid cover "almost half the annual nationwide spending on prescription drugs." *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023).

The 340B Program is built on the back of this leverage. In 1992, Congress established the 340B Program as part of the Veterans Health Care Act, and Congress amended it in 2010 as part of the Affordable Care Act. *Id.* The Program was initially meant to address an "unintended consequence" of the Medicaid Drug Rebate Program enacted in 1990 that accidentally led to the ending of the common manufacturer practice of giving discounts to hospitals and other safety-net providers. Nicholas C. Fisher, *The 340B Program: A Federal Program in Desperate Need of Revision After Two-and-a-Half Decades of Uncertainty*, 22 J. HEALTH CARE L. & POL'Y 25, 28-30 (2019). Congress was unwilling to "continue to allow" these vulnerable populations "to remain unprotected against manufacturer price increases." H.R. REP. 102-384, at 11. Thus, in response, it created the 340B Program as a means "to stretch scarce Federal resources as far as possible." *Id.* at 12. This Program allows covered entities to access pricing discounts to "reach[] more eligible patients and provid[e] more comprehensive services." *Id.* The Program represents Congress's intervention to protect the longstanding practice of providing discounted drugs to providers serving vulnerable populations.

The 340B Program is based on a voluntary "opt-in mechanism." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 115 (2011). To access the Medicare and Medicaid markets, drug makers "must offer their drugs at a discount to certain healthcare providers." *Id.* (citing 42 U.S.C. §§ 256b, 1396r-8(a)(1), (5)). The discount for those drugs is established by statute and implemented through agreements between the Secretary of Health and Human Services and each drug manufacturer that cap prices for "covered outpatient drugs." 42 U.S.C. § 256b(a)(1). The amount of this discount varies, but "the average discount rate appears to be between 25 and 50 percent." *Sanofi-Aventis U.S., LLC v. HHS*, 570 F. Supp. 3d 129, 208 (D.N.J. 2021), *aff'd in part, rev'd in part on other grounds*, 58 F.4th at 696.[1]

Providers that benefit from the 340B Program are called "covered entities," and they typically serve "low-income and rural persons." *Sanofi*, 58 F.4th at 699. "Covered entities" must meet narrow statutory categories such as "black lung clinics, rural referral centers, and hospitals that primarily serve low-income patients." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024) (citing 42 U.S.C. § 256b(a)(4)). These "include public hospitals and community health centers, many of" which are "providers of safety-net services to the poor." *Astra USA*, 563 U.S. at 113. Unsurprisingly, these healthcare providers are less profitable than providers that provide care to mostly affluent patients. If left exclusively to market whims, the number of covered entities would dwindle—decreasing the healthcare services available to the

---

[1] Novartis mentions the possibility of these drugs costing just a penny after the 340B Program discount, *e.g.*, Doc. 16 at 5, but that only happens when a drug manufacturer raises its prices faster than the rate of inflation, triggering a statutory inflation penalty. Under the calculation set forth in the 340B statute, the inflation penalty can cause the ceiling price to be zero—or even a negative amount—so the Secretary sets the price at one penny. 42 C.F.R. § 10.10(b) (March 6, 2017); 82 Fed. Reg. 1210, 1214–17 (Jan. 5, 2017).

impoverished and rural. In 2017, 74% of rural hospitals reported that they used savings from the 340B Program to keep their doors open.[2] As the Supreme Court put it, "340B hospitals perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738 (2022).

The 340B Program allows covered entities to provide these critical services in several ways. First, the Program grants them extra revenue: "they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount." *Sanofi*, 58 F.4th at 699. Second, it enables them to provide steep discounts to uninsured patients. *See* GOV'T ACCOUNTABILITY OFF., *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, But Federal Oversight Needs Improvement* 17–18 (GAO-11-836, Sept. 2011). The extra revenue helps make covered entities "profitable," thereby "stretch[ing] scarce [f]ederal resources as far as possible" to "provide more services to a larger population of under-served patients." *Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312, 316 (D.S.C. 2023) (quoting H.R. Rep. 102-384(II), at 12 (1992)). The Program allows covered entities to expand capacity, and incentivizes the creation of more entities to serve the underserved.

Congress did not grant covered entities a blank check, however. To protect against abuse, Congress limited the 340B Program in key respects. First, Congress limited "covered entities" to those that meet a narrow definition. 42 U.S.C. § 256b(a)(4). Second, covered entities are prohibited from "resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity"—a practice referred to as "diversion." *Novartis*, 102 F.4th at 456.

---

[2] 340B INFORMED, *Keeping Rural Hospitals Open is a Key Part of 340B* (Mar. 7, 2019), https://tinyurl.com/340Binformed (last accessed Aug. 14, 2025).

Third, it protects manufacturers from having to provide both a 340B discount and a Medicaid rebate. Covered entities are required to assist HRSA in ensuring that this does not happen. *Id.* In short, the 340B Program discounts only apply to patients of covered entities, and states are not allowed to add a Medicaid rebate on top of the 340B discount.

Congress also created compliance measures. Both manufacturers and the Secretary of HHS may audit covered entities. 42 U.S.C. § 256b(a)(5)(C). If the Secretary finds that the covered entity illegally resold discounted drugs or did not take the steps needed to prevent duplicate discounts, the Secretary may require a covered entity to pay "a monetary penalty to a manufacturer"—and in extreme cases even kick the covered entity out of the 340B Program entirely. *Id.* § 256b(d)(2)(B)(v)(I), (II). And when a dispute arises between covered entities and drug manufacturers about pricing, payment, diversion, or double-discounting, the 340B Program requires those parties to go through an "[a]dministrative dispute resolution process." *Id.* § 256b(d)(3). To use that process, manufacturers must first audit a covered entity, which federal law allows them to do. *Id.* § 256b(a)(5)(C). The administrative resolution of those claims constitutes "a final agency decision" that is subject to judicial review. *Id.* § 256b(d)(3)(C).

In sum, the federal statute governing the 340B Program provides for the scope of covered entities, the discounts they receive, and certain compliance measures. It does not speak to how or where covered entities may receive the covered drugs. That silence is at the heart of the ensuing series of litigation surrounding the 340B Program.

### B. HHS guidance letters

At times, the Department of Health and Human Services ("HHS") has sought to fill this statutory gap. While the HHS Secretary lacks rulemaking authority over most aspects of

the 340B Program, the Health Resources and Services Administration ("HRSA") has issued three guidance letters that "address the distribution of drugs from manufacturers to covered entities." *Novartis*, 102 F.4th at 456. In a 1994 letter, HRSA indicated that covered entities may use a "purchasing agent" to access covered drugs. Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines, 59 Fed. Reg. 25,110, 25,113 (May 13, 1994). The guidance said, "manufacturers may ship discounted drugs to this agent, which then must ship them to the covered entity for dispensing to patients." *Novartis*, 102 F.4th at 456.

In 1996, HRSA took a slightly different approach, informed by the realities of how a patient receives a prescribed drug. The typical way a patient receives a drug is that the attending doctor fills out the prescription, which is then fulfilled at a pharmacy. HRSA in 1996 observed that "many of the larger groups of covered entities . . . rely on outside pharmacies" to get necessary drugs into the hands of their patients. Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) ("1996 Guidance"). Thus, these outside pharmacies were deemed necessary for many covered entities to participate in the program. *Id.* If covered entities could not use outside pharmacies, they would face the "untenable dilemma" of choosing to invest in in-house pharmacies—"impossible" for many—or leaving the 340B Program. *Id.* Thus, if covered entities could not contract with outside pharmacies, the statute's purpose of increasing healthcare services in underserved areas would not be realized. After acknowledging that the statute "is silent as to permissible drug distribution systems," HRSA "stated that a covered entity without an in-house pharmacy may contract with a single outside pharmacy to dispense drugs at a single location." *Novartis*, 102 F.4th at 457 (citing 1996 Guidance at 43,555).

HRSA sought to expand covered entities' flexibility with its 2010 guidance. There, HRSA opined that covered entities may contract with an unlimited number of outside pharmacies regardless of whether the entities had in-house pharmacies. Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010); *Novartis*, 102 F.4th at 457. In doing so, HRSA emphasized that covered entities still possessed "full responsibility and accountability" to prevent diversion and duplicate discounts with a Medicaid Rebate claim. *Id.* at 10,273. As justification for the policy change, HRSA noted that the old model, which limited covered entities to one contract pharmacy, caused patients to experience "transportation barriers" when filling their prescriptions. *Id.* This concern was particularly acute for rural patients. Allowing an unlimited number of contract pharmacies, per HRSA, serves to ensure that patients have access to a nearby pharmacy.

### C. Accounting models for distribution

Over the years, the model for distributing and tracking 340B Program drugs evolved. When a 340B hospital relies on a contract pharmacy, it often relies on the "replenishment model." *Eli Lilly & Co. v. Kennedy*, No. 24-cv-03220, 2025 WL 1423630, at *2 (D.D.C. May 15, 2025). In this model, a covered entity establishes a relationship with a pharmacy. Consider, for example, the selling of a hypothetical Drug A. The contract pharmacy will sell prescriptions of Drug A from its own supply of drugs for which it paid the manufacturer full price. *Id.* The 340B hospital or its third-party administrator then employs software that compares information from the pharmacy with information from the covered entity to identify covered entity patients who purchased Drug A from the pharmacy in connection with their care at the covered entity. *Id.* at 3. Once a full package of Drug A has been dispensed to covered entity

patients at the pharmacy, the covered entity then purchases an order of Drug A at the 340B discounted price to replenish the pharmacy's stock. *Id.* While the drugs are sold at the pharmacy, it is the covered entity that purchases the drugs at the 340B price, and the covered entity only receives that price for the number of their patients who purchased Drug A.

The replenishment model allows a pharmacy to dispense a drug from its inventory to a covered entity's patient instead of having to wait on orders of 340B Program discounted drugs to arrive. Otherwise, the pharmacy would have to maintain two separate inventories of drugs: one for patients from covered entities and another for other patients. Such a practice is "very burdensome for many covered entities." Joel M. Hamme *et al.*, 2 HEALTH L. PRAC. GUIDE § 26A:20 (2024). Just like under any 340B Program model, the covered entity remains liable for ensuring that it only receives the Program discount for sales of drugs to its patients. And HHS audits covered entities to ensure that covered entities and their contract pharmacies are complying with the law. 42 U.S.C. § 256b(a)(5)(C).

### D. Resulting litigation

The most recent HRSA changes prompted a response from drug manufacturers. They claimed "that contract pharmacies were driving up duplicate discounting and diversion." *Sanofi*, 58 F.4th at 700. Drug manufacturers "began to limit the number and kinds of contract pharmacies to which they would ship orders." *Novartis*, 102 F.4th at 458. For example, Novartis announced that it would only ship orders to "contract pharmacies located within 40 miles of" the covered entity, and another manufacturer limited shipments to contract pharmacies that the covered entity worked with during the first three quarters of 2020. *Id.* Other restrictions often included a new requirement to provide "claims data associated with

all 340B contract pharmacy orders." *Id.*

In response, in 2020, HHS released "an Advisory Opinion declaring that Section 340B unambiguously requires drug makers to deliver 340B drugs to an unlimited number of contract pharmacies." *Sanofi*, 58 F.4th at 701 (citing HHS Off. Gen. Couns., Advisory Opinion 20-06 on Contract Pharmacies Under the 340B Program (Dec. 30, 2020)). HHS argued that because the drugs were purchased by covered entities for their patients, the location of the delivery of those drugs was irrelevant. *Id.* Subsequently, HHS sent violation letters to the manufacturers that imposed limits on contract pharmacies. *Id.* Those letters spawned litigation over HHS's authority to mandate that manufacturers allow an unlimited number of contract pharmacies.

In those cases, drug manufacturers argued that HHS could not require them to recognize an unlimited number of contract pharmacies in this context because "Section 340B . . . is silent as to whether manufacturers must deliver those drugs to contract pharmacies." *See, e.g.*, Novartis Opening Brief at 4, *Novartis Pharms. Corp. v. Johnson*, No. 21-5299, Doc. 1949831 (D.C. Cir. June 8, 2022). The Third Circuit and D.C. Circuit agreed. The courts ruled that the text of Section 340B is "silent about delivery" and does not "mention contract pharmacies." *Sanofi*, 58 F.4th at 703; *Novartis*, 102 F.4th at 460. Thus, the courts held that the federal statute itself does not "requir[e] delivery of discounted drugs to an unlimited number of contract pharmacies." *Sanofi*, 58 F.4th at 706. Where Congress declined to legislate, HHS could not "move the program forward." 1996 Guidance at 43,550.

### E. States' responses

Following these decisions, various states quickly jumped in to fill the regulatory vacuum. As drug manufacturers began to more uniformly impose distribution policies limiting

covered entities' ability to contract with outside pharmacies, "covered entities dependent on contract pharmacies [became] unable to serve patients in need." *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1139 (8th Cir. 2024). Thus, a number of states responded by enacting legislation that "prohibits manufacturers from limiting covered entities' ability to contract with outside pharmacies." *Id.*[3] As the present lawsuit shows, manufacturers have not taken this development lying down. Drug companies have filed lawsuits across the country challenging these laws on preemption and dormant Commerce Clause grounds. And across the country, the manufacturers have lost. Repeatedly. *See, e.g.*, *McClain*, 95 F.4th at 1146; *Pharm. Rsch. & Mfrs. of Am. v. Fitch*, No. 1:24-cv-160-HSO-BWR, 2024 WL 3277365, at *12 (S.D. Miss. July 1, 2024) (*Fitch I*); *AbbVie Inc. v. Fitch*, No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965, at *9 (S.D. Miss. July 22, 2024) (*Fitch II*); *AstraZeneca Pharm. LP v. Fitch*, 766 F. Supp. 3d 657, 660 (S.D. Miss. 2024) (*Fitch III*); *Pharm. Rsch. & Mfrs. of Am. v. Bailey*, No. 2:24-CV-04144-MDH, 2025 WL 644281, at *3 (W.D. Mo. Feb. 27, 2025); *AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271, at *19 (M.D. Tenn. June 30, 2025); *Pharm. Rsch. & Mfrs. of Am. v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *15 (W.D. La. Sept. 30, 2024); *AbbVie Inc. v. Bailey*, No. 4:24-cv-996, 2025 WL 1918948, at *10 (E.D. Miss. July 11, 2025). *But see Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 446 (S.D.W.V. 2024).

---

[3] *See, e.g.*, Arkansas (Ark. Code § 23-92-601 *et seq.)*; Colorado (Colo. R.S. § 6-29-101 *et seq.)*; Hawaii (H.B. 712 (2025)); Kansas (Kan. Stat. § 65-483); Louisiana (La. Rev. Stat. § 40:2883); Maine (L.D. 210 pt. P (2025)); Maryland (H.B. 1056 (2024)); Minnesota (H.F. 4991 (2024)); Mississippi (Miss. Code § 75-24-5); Missouri (S.B. 751 (2024)); Nebraska (Neb. L.B. 168, § 3(1) (2025)); New Mexico (N.M. H.B. 78 (2025)); North Dakota (N.D. Cent. Code § 43-15.3-08); Oregon (H.B. 2385 (2025)); Rhode Island (S.0114 (2025)); South Dakota (S.B. 154 (2025)); Tennessee (S.B. 1414 (2025)); Utah (Utah Code § 31A-46-311); Vermont (H.266 (2025)); and West Virginia (W. Va. Code § 60A-8-6a).

### F. Oklahoma law

Oklahoma soon enacted its own version of these laws, which is at the center of the controversy here. Faced with complaints from around the State that restrictions on the covered entities' contracts with outside pharmacies threatened their ability to provide effective services to underserved communities, the Oklahoma Legislature overwhelmingly voted on a bipartisan basis to enact HB 2048. OKLA. STATE LEGISLATURE, *Bill Information for HB 2048*.[4] The bill's co-authors argued that allowing restrictions on the delivery of 340B drugs to contract pharmacies would "undermine[] protections for essential medical services, including cancer treatments and obstetrical care, across [the] state." State of Okla. House of Representatives, *Stinson, Howard Comment on Governor's Veto of Bill to Protect Rural Health Care*, May 21, 2025.[5]

Codified at OKLA. STAT. tit. 36, § 5401, *et seq.*, HB 2048 states that "[a] manufacturer shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity, unless such receipt is prohibited by [HHS]." *Id.* § 5403(A). Similarly, "[a] manufacturer shall not interfere with a pharmacy contracted with a 340B entity." *Id.* § 5403(B). Together, these provisions prohibit manufacturers from stopping covered entities in Oklahoma from contracting with outside pharmacies to provide their patients 340B discounted drugs. HB 2048 also protects covered entities from being subject to onerous conditions in order to receive 340B Program drugs at contract pharmacies. *Id.* § 5402. For example, a manufacturer shall not "requir[e] a claim for a drug to include any identification, billing modifier, attestation, or other indication that a drug

---

[4] *Available at* https://www.oklegislature.gov/BillInfo.aspx?Bill=hb2048&Session=2500.
[5] *Available at* https://www.okhouse.gov/posts/news-20250521_1.

is a 340B drug in order to be processed or resubmitted unless it is required by [the federal government] or the Oklahoma Health Care Authority." *Id.* § 5402(A)(4).

Enforcement of HB 2048 is split between the Oklahoma Insurance Department and the Oklahoma Attorney General. *Id.* § 5404. The Insurance Department is tasked with enforcing the law against health insurers, and the Attorney General enforces it against all other regulated parties. *Id.* Furthermore, the Attorney General may establish rules and regulations interpreting HB 2048, and he may impose civil fines up to $10,000 for each violation. *Id.* § 5404(B). Novartis repeatedly raises the specter of criminal liability, *e.g.*, Doc. 16 at 13, but nothing in HB 2048 grants the Attorney General the authority to seek criminal penalties.

### G. The present lawsuit

Here, Novartis alleges that HB 2048 violates the Supremacy Clause and the dormant Commerce Clause. Doc. 1 at 31, 42. Novartis has now moved for a preliminary injunction on both claims. Doc. 15. Novartis advances sprawling claims of both field and conflict preemption. Doc. 16 at 14–26. As to the dormant (or "negative") Commerce Clause, Novartis argues that HB 2048 unlawfully regulates outside Oklahoma, discriminates against interstate commerce in favor of intrastate commerce, and imposes an incommensurate burden on interstate commerce in relation to the local benefits secured. *Id.* As numerous courts across the country have already decided, however, these claims fail. For the reasons provided below, this Court should deny Novartis a preliminary injunction.

### ARGUMENT AND AUTHORITIES

"A preliminary injunction is an extraordinary and drastic remedy . . . it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (cleaned up). To obtain it, a claimant

"must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). "[T]he right to relief must be clear and unequivocal." *Poe v. Drummond*, No. 23-5110, 2025 WL 2238038, at *2 (10th Cir. Aug. 6, 2025) (citation omitted); *see also United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888–89 (10th Cir. 1989). Because it is "an extraordinary and drastic remedy," a preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion" as to each element. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quotation omitted). Even if a movant satisfies the four factors, whether to grant or deny a preliminary injunction remains discretionary. *Free the Nipple–Fort Collins v. City of Fort Collins*, 916 F.3d 792, 796 (10th Cir. 2019). Put simply, a preliminary injunction is "the exception rather than the rule." *Id.* at 797 (quotation omitted).

The burden is even higher when, like here, a plaintiff facially challenges the law. Because "'facial challenges threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways[,]" the Supreme Court has "made facial challenges hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (citation omitted). Indeed, to prevail on a facial challenge, a plaintiff must normally show "that *no set of circumstances* exists under which" the challenged statute can be constitutionally applied. *United States v. Hansen*, 599 U.S. 762, 769 (2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Because Novartis cannot meet this burden, Novartis's motion should be denied.

## I. NOVARTIS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS.

To demonstrate a substantial likelihood of success on the merits, a plaintiff must ordinarily "present 'a prima facie case showing a reasonable probability that [it] will ultimately be entitled to the relief sought.'" *Salt Lake Trib. Pub. Co. v. AT&T Corp.*, 320 F.3d 1081, 1100 (10th Cir. 2003) (citation omitted). That has not happened here.

### A. HB 2048 is not preempted.

We begin with first principles: "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)). Under the Supremacy Clause, "the Laws of the United States" take priority over conflicting state laws. U.S. CONST. art. VI, cl. 2. But "the states are sovereign, save only as Congress may constitutionally subtract from their authority." *Parker v. Brown*, 317 U.S. 341, 351 (1943). Congress can preempt state laws in several ways. The simplest way is "through express language in a statute." *Oneok, Inc., v. Learjet, Inc.*, 575 U.S. 373, 376 (2015). Critically, Novartis has not pointed to any express preemption language here.

When a statute does not refer to preemption, a plaintiff must demonstrate that Congress "implicitly pre-empt[ed]" the state law. *Id.* That can be done through either field preemption or conflict preemption. *Id.* at 377. Field preemption occurs only when "Congress has forbidden the State to take action in the field that the federal statute pre-empts." *Id.* In other words, Congress must determine that a particular field "must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. Conflict preemption occurs when "compliance with both state and federal law is impossible," or when the State law is "an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress." *California v. ARC Am. Corp.*, 490 U.S. 93, 100–01 (1989) (quotations and citation omitted). The party asserting preemption "bears the burden of showing with specificity that Congress intended to preempt state law." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 489 n.4 (10th Cir. 1998).

Novartis argues that HB 2048 is preempted under field preemption and conflict preemption rationales. Both claims fail for the simple reason that HB 2048 regulates drug delivery. The federal 340B Program statute regulates the price that manufacturers must offer to covered entities, but it is silent as to delivery. Contract pharmacies are not even mentioned in the statute—indeed, the word "pharmacy" is nowhere to be found. Where Congress has not acted, there can be no preemption. HB 2048 falls comfortably within the long tradition of state laws regulating public health. To hold otherwise would flip federalism on its head.

## 1. The presumption against preemption applies here.

Because preemption intrudes on the States' sovereign ability to govern, any preemption analysis "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . [a] Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (citation omitted); *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins.*, 514 U.S. 645, 654 (1995) ("[W]e have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law."). This presumption applies particularly to "state or local regulation of matters related to health and safety." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715 (1985). As

a result, the Tenth Circuit "is especially reluctant to find preemption in matters of longstanding state regulation." *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1242 (10th Cir. 2011).

HB 2048 prohibits drug manufacturers from refusing to deliver 340B discounted drugs to contract pharmacies, in order "to maximize covered-entity patients' access to drugs for which the manufacturers have already agreed to provide a discount." *AbbVie Inc. v. Fitch*, No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965, at *9 (S.D. Miss. July 22, 2024) (*Fitch II*). The covered entities "valuable services for low-income and rural communities" are supported by HB 2048. *See Am. Hosp. Ass'n*, 596 U.S. at 738. By regulating the distribution of drugs to pharmacies, Oklahoma affects "the practice of pharmacy" which "is an area traditionally left to state regulation." *PCMA v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021). Plainly then, HB 2048 regulates "matters related to health and safety." *Hillsborough Cnty.*, 471 U.S. at 715. When faced with similar statutes, courts have applied the presumption against preemption. *McClain*, 95 F.4th at 1143; *Fitch II*, at *9; *Skrmetti*, 2025 WL 1805271, at *12. This Court should do the same.

## 2. Congress has not preempted the field.

Field preemption can be justified only by "a demonstration that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress." *DeCanas v. Bica*, 424 U.S. 351, 357 (1976), *superseded by statute on other grounds as recognized in Arizona*, 567 U.S. at 404, and *Kansas v. Garcia,* 589 U.S. 191, 195 (2020) (quotations omitted). Nothing less than an "unambiguous congressional mandate" will support a finding of field preemption. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963). Only "[i]n rare cases" has the Supreme Court held "that Congress

'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas*, 589 U.S. at 208 (citation omitted). Needless to say, Novartis faces an extremely high burden to show field preemption.

The starting point in any field preemption analysis is to "identify the legislative field that the state law at issue implicates." *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1325 (10th Cir. 2010). Then, courts "evaluate whether Congress intended to occupy the field to the exclusion of the states." *Id.* HB 2048 does not regulate an exclusively federal field.

Start with the text of the federal 340B Program statute. The Program regulates the price paid by certain covered healthcare providers to receive drugs for their patients. More specifically, it caps the price that participating manufacturers may "offer" covered entities, 42 U.S.C. § 256b(a)(1), and then it imposes requirements on those entities, *id.* § 256b(a)(5). Those requirements include a prohibition on diversion as well as a prohibition on duplicate discounts. *Id.* § 256b(a)(5)(A), (B). To enforce those requirements, the statute provides for audits and grants the HHS Secretary the ability to impose monetary penalties. *Id.* § 256b(a)(5)(C), (D). Thus, the statute addresses the field of drug pricing—at least in relation to certain healthcare providers, drugs, and manufacturers. It does not even fully occupy that field.

Congress's "framework of regulation," *Arizona*, 567 U.S. at 399, expands no further than the statutory text here. That framework does not implicate the delivery of drugs. Section 340B is "silent about delivery conditions." *Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 703 (describing Section 340B as being "silent about delivery."). That silence has even been acknowledged by the entity in charge of implementing the program. *See* 1996 Guidance, 61 Fed. Reg. at 43,549–50. Indeed, "[n]owhere does Section 340B mention contract pharmacies,"

*Sanofi*, 58 F.4th at 703, much less prevent States from regulating their receipt of 340B drugs. Even Novartis admits "the statute's silence" about the "number of contract pharmacies" a manufacturer may or may not recognize. Doc. 16 at 12.

HB 2048 merely regulates the delivery of drugs. Specifically, it prohibits manufacturers from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] with . . . the acquisition of a 340B drug . . . or [the] delivery" of said drug. OKLA. STAT. tit. 36, § 5403(A). The neighboring provision states that "[a] manufacturer shall not interfere with a pharmacy contracted with a 340B entity." *Id.* § 5403(B). In effect, HB 2048 ensures that covered entities are able to contract with outside pharmacies and receive the covered drugs at those pharmacies. Oklahoma law does not regulate or affect the price of drugs at all. *See McClain*, 95 F.4th at 1145. It certainly does not interfere with the discount rates set under the 340B program. HB 2048 does not care about the discount price chosen by HHS. HB 2048 is merely concerned with ensuring that the covered entity can receive those covered drugs at locations accessible to their patients. Oklahoma has not "enter[ed] . . . an area the Federal Government has reserved for itself." *Arizona*, 567 U.S. at 402. Accordingly, HB 2048 is not field preempted.

Despite this issue being litigated across the country, Novartis cites not a single case where a court has found field preemption. Several courts have found the opposite. *See, e.g.*, *McClain*, 95 F.4th at 1144; *Fitch I*, 2024 WL 3277365, at *12. The cases and arguments Novartis does rely on are unavailing. Novartis misconstrues *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011). Doc. 16 at 16. That case analyzed whether a covered entity within the Section 340B Program could sue manufacturers for overcharging. 563 U.S. at 113. The plaintiff conceded that the statute provided no private right of action for covered entities to sue on

this basis. But the plaintiff alleged that it could sue as a third-party beneficiary to the agreement between HHS and the manufacturer setting the 340B price. *Id.* The Supreme Court disagreed. Because the statute did not grant a private cause of action, HHS's enforcement process was deemed the exclusive means to enforce the 340B price. *Id.* at 120. This decision did *not* deal with preemption, at all. And HB 2048 is not inconsistent with *Astra*'s conclusion. *Fitch I*, 2024 WL 3277365, at *12 ("The Supreme Court's rejection of a right of action for covered entities . . . has minimal bearing on whether Section 340B preempts state law about the delivery of 340B drugs."). HB 2048 is silent as to the 340B price. If a covered entity believes a manufacturer is charging more than the 340B price, HB 2048 provides the entity no recourse. HB 2048 steps in only if the manufacturer refuses to deliver the entity's 340B drugs to a contracted pharmacy. *Murrill*, 2024 WL 4361597, at *8 (noting that a similar statute "pertains solely to pharmaceutical companies' actions toward pharmacies who enter into contracts with covered entities under the Section 340B program"). Again, HB 2048 regulates only delivery of drugs, not their price.

Novartis then falls back on the claim that HB 2048 aims to alter the terms of the 340B Program. Doc. 16 at 17. The law does no such thing. As Novartis itself has repeatedly argued, the federal 340B statute is silent with respect to the delivery of covered drugs to covered entities or contract pharmacies. *Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 703. Oklahoma cannot change something that does not exist. Novartis cites *Forest Park II v. Hadley*, 336 F.3d 724, 732 (8th Cir. 2003), for the proposition that "state statutes may not interfere with the implementation of a federal program by a federal agency." Doc. 16 at 17. True enough. But in that case, the Eighth Circuit was presented with a Minnesota law that directly contradicted a

federal program; specifically, it added additional requirements for a participant to withdraw from the program. *Id.* at 731. Crucially, "the state law force[d] the federal government to continue to provide financial assistance to the participant when both the federal government and the participant have chosen to end their relationship." *Id.* at 732. Nothing of the sort occurs here. Federal law is silent as to contract pharmacies, and Oklahoma's law is silent as to price. Thus, there is no contradiction between Oklahoma and federal law. To the contrary, HB 2048 "assists in fulfilling the purpose of 340B." *McClain*, 95 F.4th at 1145.

Novartis's claim that HB 2048 "regulates relationships that 'originate[] from, [are] governed by, and terminate[] according to federal law'" is simply incorrect. Doc. 16 at 17 (quoting *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1105 (10th Cir. 2015)). *Helfrich* involved a contract between Blue Cross Blue Shield and the federal government concerning the provision of healthcare to government employees. *Id.* at 1098. It is hard to imagine a field that is more "uniquely federal" than that. *Id.* Here, the relationships between healthcare providers, pharmacies, and drug manufacturers are certainly not created or terminated by the federal government. Moreover, again, the 340B Program does not even mention pharmacies.[6]

HB 2048 is not field preempted. *See, e.g.*, *McClain*, 95 F.4th at 1144 ("in enacting Section 340B, Congress did not intend to preempt the field").

### 3.  HB 2048 does not conflict with federal law.

No provision of HB 2048 is preempted due to a conflict with federal law. Conflict

---

[6] Curiously, Novartis implies that Governor Stitt's veto of HB 2048 supports its field preemption arguments. Doc. 16 at 18. But a statement that reform would best occur at the federal level is not a suggestion that the federal government has preempted the field. And regardless, the views of a state executive have no bearing on whether a statute is preempted, especially not when his veto was overridden by legislators who took a different view.

preemption exists only where it is "impossible" to comply with state and federal law or where state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok*, 575 U.S. at 377 (citation omitted). This is necessarily a high hurdle for plaintiffs to meet. "In all cases," the purported "conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress." *Kansas*, 589 U.S. at 202. A "freewheeling judicial inquiry" is inappropriate, nor is it enough if "a state statute is in tension with federal objectives." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (quotation omitted). Rather, "a high threshold must be met" for a court to hold that a state law conflicts with a federal law. *Id.* This threshold requires "clear evidence." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000). Novartis has not met that threshold.

There is no conflict here. The 340B Program consists of "three basic parts: (1) a cap on drug makers' prices, (2) restrictions on covered entities, and (3) compliance mechanisms." *Sanofi*, 58 F.4th at 699. For prices, the ceiling price is set by statute. *Id.* at 700. The manufacturers are required to offer that price to covered entities, provided that the specific drug is available to purchasers. *Id.* The covered entities are prohibited from diverting the drugs to other patients or getting the 340B discount on drugs already subject to a Medicaid rebate. *Id.* Although the "substantive requirements and restrictions are few," the compliance mechanisms are varied. *Id.* Manufacturers and covered entities are subject to audits. 42 U.S.C. § 256b(a)(1), (a)(5)(C). HHS may impose sanctions, *id.* §§ 256b(a)(5)(D), (d)(1)–(2), and there is a resolution process for resolving "payment, pricing, diversion, or discount disputes." *McClain*, 95 F.4th at 1142.

HB 2048 regulates different conduct. It prohibits manufacturers from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] with . . . the **acquisition** of a 340B drug . . . or [the] **delivery**" of said drug. OKLA. STAT. tit. 36, § 5403(A) (emphases added). It provides that "[a] manufacturer shall not interfere with a pharmacy contracted with a 340B [covered] entity." *Id.* § 5403(B). Elsewhere, it prohibits health care entities from discriminating against covered entities in several ways, including by imposing certain terms and conditions on covered entities that are not imposed on non-covered entities or by "requiring a claim for a drug to include any . . . indication that a drug is a 340B drug in order to be processed or resubmitted" unless it is federally required. *Id.* § 5402(A)(2), (4). HB 2048 authorizes enforcing entities to establish rules and regulations and allows "civil fines" for violations. *Id.* § 5404.

HB 2048 does not conflict with the 340B Program. It is not "impossible" to comply with federal and state law, *Oneok*, 575 U.S. at 377, and Novartis barely tries to claim otherwise. *See Murrill*, 2024 WL 4361597, at *8 ("Plaintiffs cannot credibly argue that it is impossible to comply with both [a similar state law] and the federal Section 340B program"). Start with the price caps set under federal law. HB 2048 does not require manufacturers to offer covered drugs at a rate lower or higher than the negotiated prices. It only forbids manufacturers from imposing certain delivery restrictions on covered entities, a topic that is unmentioned in the 340B Program statutes. HB 2048 "addresses delivery and Section 340B does not." *Fitch I*, 2024 WL 3277365, at *11. Nor does HB 2048 affect the restrictions Section 340B places on covered entities. It does not expand or narrow the definition of a "covered entity," it does not authorize duplicate discounts or diversion, and does not touch on auditing. *See Murrill*, 2024 WL 4361597, at *8. HB 2048 also does not affect the 340B Program's compliance framework. HB

2048 does not enforce any rights or duties under the Program. Instead, HB 2048 imposes penalties for refusing to "deliver[]" discounted drugs, bought by a covered entity, to a contract pharmacy that delivers the drugs to entity patients. *McClain*, 95 F.4th at 1145. Further, HB 2048 does not impose penalties on covered entities for diversion or duplicate discounts, or on drug manufacturers for charging more than the established 340B price.

Instead of conflicting with the 340B Program, HB 2048 merely regulates an aspect "of the drug distribution chain"—about which 340B is "silent." *McClain*, 95 F.4th at 1142. Namely, HB 2048 regulates the delivery and distribution of drugs to contract pharmacies. As the Program is "silent about delivery" and does not "mention contract pharmacies," 340B leaves room for states to regulate in this space. *Sanofi*, 58 F.4th at 703. In the face of this "Congressional silence," "it will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intent to do so." *Paul v. Monts*, 906 F.2d 1468, 1475 n.8 (10th Cir. 1990) (per curiam) (quotation omitted). Within the 340B Program, no clear manifestation of preemptive intent can be found. That conclusion is reinforced by the States' broad authority to "regulat[e]" matters of "health and safety." *Hillsborough Cnty.*, 471 U.S. at 719. Regulating the distribution and delivery of drugs—to ensure that patients in need receive them—is a matter of health and safety over which States undeniably have authority. *Fitch I*, 2024 WL 3277365, at *8.

> ### a. HB 2048 does not expand the number of eligible 340B patients in Oklahoma.

Novartis argues that HB 2048 expands the number of transactions triggering the 340B Program discount. But this misunderstands what Oklahoma law accomplishes. Novartis concedes—as it must—that the 340B Program merely requires manufacturers to "offer each

covered entity covered outpatient drugs for purchase at or below the applicable ceiling price," 42 U.S.C. § 256b(a)(1), and that federal courts have found the statute silent as to delivery to contract pharmacies, Doc. 16 at 18–19. Novartis attempts to contort this silence into a prohibition on state regulation of delivery. *Id.* at 19. But that is not the case. It is one thing to say that Congress chose not to regulate delivery; it is another thing altogether to say that Congress's silence forecloses state regulation. The "[s]tatutory silence[]," *Sanofi*, 58 F.4th at 699, "that does not implicitly mandate that manufacturers deliver to any contract pharmacy does not, on the other hand, show that Congress clearly intended to preclude states from enacting their own public health regulations aimed at maximizing the availability of low-cost drugs for covered-entity patients." *Fitch II*, 2024 WL 3503965, at *10. That is especially so with "the practice of pharmacy," which "is an area traditionally left to state regulation." *Wehbi*, 18 F.4th at 972. With pharmaceutical drugs, courts have "long maintained that state law offers an additional, and important, layer of consumer protection that complements [federal regulation]." *Lefaivre v. KV Pharm. Co.*, 636 F.3d 935, 941 (8th Cir. 2011) (quoting *Wyeth v. Levine*, 555 U.S. 555, 579 (2009)). As such, requiring manufacturers to deliver "a covered entity's 340B drugs to contract pharmacies . . . creates no obstacle." *McClain*, 95 F.4th at 1145.

Novartis claims that HB 2048 "add[s] contract pharmacies as a sixteenth type of covered entity to whom manufacturers must 'offer' 340B prices." Doc. 16 at 19. This argument "mischaracterize[s] the relationship between covered entities and their contract pharmacies." *Murrill*, 2024 WL 4361597, at *6. The covered entities that may purchase 340B drugs are defined by federal statute. 42 U.S.C. § 256b(a)(4). HB 2048 does not change or affect that definition. OKLA. STAT. tit. 36, § 5401(2); *see also Fitch I*, 2024 WL 3277365, at *9. For purposes

24

of Oklahoma law, a "340B entity" includes a covered entity's contract pharmacy, but that does not mean that the pharmacy itself may purchase drugs at the discount price. First, "covered entities" and "340B entity" are not the same term. Second, while it is true that HB 2048 forbids manufacturers from "restrict[ing]" a "340B entity" from receiving a "340B drug," the Act defines "340B drug" in a way that prohibits pharmacies from purchasing drugs at the 340B discount. *Id.* §§ 5401(1), 5403(A). Specifically, "340B drug" is defined to only include drugs "purchased by a covered entity." *Id.* § 5401(1). The only entities that can access the 340B discount are those permitted by federal law to purchase drugs at those prices. Under state statute, therefore, "[p]harmacies do not purchase 340B drugs, and they do not receive 340B price discounts." *McClain*, 95 F.4th at 1144. There is no conflict on this point.

Furthermore, allowing covered entities to receive discounted drugs at their contract pharmacies does not "improperly swell" the 340B Program. Doc. 16 at 19. If anything, the law merely returns the Program to the way it has operated since 2010, given that manufacturers began refusing to deliver to contract pharmacies only a few years ago. Under the Program, covered entities are entitled to purchase drugs at a discount price. 42 U.S.C. § 256b(a)(1). Although covered entities are forbidden from diverting discounted drugs to nonpatients, there is no ceiling to the number of drugs that a covered entity may purchase. Therefore, if a patient needs a drug, the covered entity may *always* purchase a discounted 340B drug for that patient. This means that if a covered entity has the drugs delivered to its own pharmacy, the manufacturer is obligated to send an unlimited number to that location. It is only when the covered entity wants the drugs to be delivered to outside "contract" pharmacies that Novartis seeks to restrict deliveries. HB 2048 merely ensures that covered entities can have those drugs

delivered to outside pharmacies that are more accessible to their patients. It does not increase the number of transactions subject to the 340B discount. *McClain*, 95 F.4th at 1142.

Novartis next argues that HB 2048 is a drug-pricing law because "[p]rice is what distinguishes between an 'ordinary drug' and a 340B Program drug" and the obligations in HB 2048 only attach to 340B drugs. Doc. 16 at 20 (quoting *Morrisey*, 760 F. Supp. 3d at 455). But Oklahoma's decision to distinguish between 340B discounted drugs and non-340B drugs does not make the law a drug-pricing law. It is simply an acknowledgment that there is a difference between discounted and non-discounted drugs here. And it is rational to regulate different things differently. In any event, Oklahoma's "statute says nothing about price." *Skrmetti*, 2025 WL 1805271, at *18. Indeed, as the Eighth Circuit held in analyzing and declining to enjoin a similar statute, the law "does not set or enforce discount pricing." *McClain*, 95 F.4th at 1145. Instead, HB 2048 prohibits Novartis "from imposing restrictions on where it is willing to *deliver* drugs that have been purchased by covered entities under the 340B discount." *Skrmetti*, 2025 WL 1805271, at *18. Drug manufacturers are only placing these delivery restrictions on drugs subject to the 340B discount, so it is unsurprising that HB 2048 focuses on blocking those specific restrictions. If a man passes out during a parade, first responders rush to treat him; they do not check on the other people on the surrounding street at the same time.

Novartis's reliance on the fact that the same drugs are being delivered to pharmacies at the full price is a red herring. Doc. 16 at 20. Pharmacies are not covered entities, so they are not entitled to purchase their drugs at the 340B price. 42 U.S.C § 256b(a)(4). Under HB 2048, pharmacies are still not covered entities and will still have to purchase drugs at the full price. Oklahoma is not regulating the prices of any given drugs; it is only insisting that the 340B

Program drugs be made available to the agents of covered entities—entities that are concededly entitled to receive and dispense the discounted drugs. *McClain*, 95 F.4th at 1145.

Novartis spills much ink complaining about the "replenishment" model—one of several ways in which 340B Program drugs are tracked. Doc. 16 at 20–21. But this has no relevance to this case. Novartis apparently believes "retroactively analyz[ing] data," *id.* at 20, to determine which drugs qualify for the 340B discount is inconsistent with the spirit of the Program, but that has nothing to do with Oklahoma law.[7] HB 2048 only requires that manufacturers deliver to pharmacies the drugs that covered entities purchase. The appropriateness of the replenishment model is entirely the purview of the federal government. On this front, Novartis's quarrel lies with the federal government, not Oklahoma. If Congress passed a law banning the replenishment model tomorrow, Oklahoma's law would operate completely unchanged. *AbbVie Inc. v. Bailey*, No. 4:24-cv-996, 2025 WL 1918948, at *8 (W.D. Mo. Feb. 24, 2025). This underscores the absence of conflict between the two laws.

       *b.*   *HB 2048's enforcement procedures and remedies do not conflict with federal law.*

HB 2048's enforcement mechanisms do not conflict with the 340B Program's enforcement regime because the two statutes apply to different fields. Novartis once again relies on *Astra*, Doc. 16 at 22, without acknowledging that *Astra* examined whether a covered entity could sue manufacturers for overcharging, as opposed to a preemption claim, 563 U.S. at 116. *Astra* does not stand for the proposition that all decisions possibly touching on the

---

[7] Indeed, more than once Novartis not-so-subtly conveys its disdain for the entire 340B Program. *See, e.g.*, Doc. 16 at 2 (bemoaning the "ballooning fraud, waste, and abuse within the 340B Program"); *id.* at 5 ("the 340B statute does not require covered entities to pass on 340B savings to patients, and they rarely do"). Novartis simultaneously wants to throw the Program under the bus and use it as a weapon to strike down state laws.

340B Program must be made by the HHS. *Cf. Sanofi*, 58 F.4th at 703. Instead, it recognized only that Congress had created an "administrative framework . . . for covered entities complaining of '*overcharges* and other violations of the discounted *pricing requirements*." *Astra USA*, 563 U.S. at 122 (quoting 42 U.S.C. § 256b(d)(1)(A) (emphases added)). *Astra* does not control here.

In enforcing HB 2048, Oklahoma will have nothing to say or do with "pricing requirements." Oklahoma adjudicators will only be asked to decide (1) whether manufacturers delivered the drugs to where covered entities (who are listed in a federal database) wanted them delivered, or (2) whether manufacturers imposed certain discriminatory requirements as a condition precedent to delivery. Only those two acts potentially create liability under HB 2048. And even *Astra* seems to recognize that there can be room for assertions that drugmakers "violated a[] substantive obligation arising only from" something independent of the "340B ceiling price." *Id.* at 118–19. As any lawsuits under HB 2048 will focus on delivery, those suits will not be attempts to force manufacturers to comply with the federal Program. By the same token, HHS's enforcement process says nothing about delivery, so that process will not be parallel to Oklahoma proceedings. *See, e.g., Novartis*, 102 F.4th at 460.

Similarly, enforcement of HB 2048 will not require Oklahoma to adjudicate questions of federal law. Arguing the contrary, Novartis raises the hypothetical of a manufacturer "cut[ting] off a contract pharmacy's access to 340B-priced product because it has evidence of diversion." Doc. 16 at 24. But this hypothetical is strange because a pharmacy is not a covered entity and thus would never purchase a drug at the 340B Program price. 42 U.S.C. § 256b(a)(4). Under federal law, only covered entities can purchase drugs at a 340B price. They are the

entities that are liable for diversion. *Id.* § 256b(a)(5)(B) ("a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity"); 42 C.F.R. § 10.21(a)(2) (permitting manufacturers to make a claim that a "covered entity" diverted 340B drugs). In that scenario, the manufacturers would presumably cut off access to 340B drugs *to the covered entity itself*. If that were the case, Oklahoma law would have no bearing on the dispute. The qualifications to participate in the 340B Program are set and enforced at the federal level. Therefore, the manufacturer's remedy would involve HRSA enforcement.

Moreover, this hypothetical is illusory because the 340B Program does not allow manufacturers to unilaterally stop offering a discount to covered entities. *Skrmetti*, 2025 WL 1805271, at *19 n.11. The provisions cited by Novartis only authorize sanctions on covered entities "in appropriate cases as determined by the Secretary." 42 U.S.C. § 256b(d)(2)(B)(v); 42 C.F.R. § 10.21(a)(2). And even if a manufacturer refused to deliver drugs to any particular pharmacy, there would be no conflict between state and federal law. That a manufacturer might raise federal law in defense to a state claim does not mean the state law actually conflicts with federal law. Regardless, this issue would be appropriate for an as-applied challenge at most, not a facial challenge as we have here.

Finally, Novartis's emphasis on the different remedies between the 340B Program and HB 2048 is misplaced. Doc. 16 at 25–26. Again, these two statutory schemes address two different forms of conduct. The 340B Program's enforcement mechanisms against manufacturers punish for charging the wrong price. HB 2048 punishes for interfering with the delivery of drugs. Thus, these "two separate remedies" are not "brought to bear on the same activity." *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986). And

regardless, even if they did that still does not automatically counsel for preemption. There are countless topics, after all, on which the federal and state governments simultaneously regulate and punish, often with different remedies—*e.g.*, murder, bank robbery, fraud, etc. *See, e.g., Kansas*, 589 U.S. at 212. "[S]eparate adjudications overseen by different actors," Doc. 16 at 25, are utterly commonplace in our federalist system.[8]

### B. HB 2048 does not violate the dormant Commerce Clause.

The dormant Commerce Clause primarily targets state laws that "discriminate[] against out-of-state goods or nonresident economic actors." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) ("[T]his antidiscrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence.") (citation omitted). At the same time, however, "[t]he dormant Commerce Clause is not a roving license for federal courts to decide what activities are appropriate for state and local government to undertake." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007). Rather, enjoining "a democratically adopted state law" on this ground "is a matter of 'extreme delicacy'" which "courts should do only 'where the infraction is clear.'" *Nat'l Pork Producers Council*, 598 U.S. at 390.

Dormant Commerce Clause cases "come in three varieties." *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1171 (10th Cir. 2015). One variety—involving the controversial *Pike*

---

[8] Novartis also complains that HB 2048 does not expressly contain a scienter requirement. Doc. 16 at 26. HB 2048, however, authorizes the Attorney General "to establish rules and regulations interpreting the provisions of [the Act]." OKLA. STAT. tit. 36 § 5404. As Novartis filed a pre-enforcement challenge, the Attorney General has not had the opportunity to issue such regulations. Those rules and regulations might include an intent requirement. And a potential future application of the law to a manufacturer for a violation that lacked intent would be grounds for an as-applied challenge, not reason to facially enjoin the law.

balancing test—"allow[s] judges to strike down state laws burdening interstate commerce when they find insufficient offsetting local benefits." *Id.* Two, a state statute runs afoul of the dormant Commerce Clause when it "clearly discriminates against interstate commerce in favor of intrastate commerce," unless that discrimination is justified "by a valid factor unrelated to economic protectionism." *KT & G Corp. v. Att'y Gen. of Okla.*, 535 F.3d 1114, 1143 (10th Cir. 2008). Lastly, a statute is suspect "if it has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question." *Id.* Novartis argues that HB 2048 is unconstitutional under each of the three theories. Not so. This Court should reject Novartis's dormant Commerce Clause claims just like every other court to examine drug manufacturers' claims against similar laws has done. *See, e.g., Novartis Pharms. Corp. v. Bailey*, No. 2:24-cv-04131, 2025 WL 595189, at *3–5; *Fitch I*, 2024 WL 3277365, at *12–13; *Skrmetti*, 2025 WL 1805271, at *22–24.

## 1. HB 2048 is not unlawfully extraterritorial.

Novartis claims that HB 2048 is unlawfully extraterritorial in nature because it "applies to transactions between out-of-state manufacturers and wholesalers that take place entirely outside Oklahoma's borders." Doc. 16 at 27. Just two years ago, however, the Supreme Court emphasized that there is no per se rule against state laws that "have the practical effect of controlling extraterritorial behavior." *Nat'l Pork Producers Council*, 598 U.S. at 373–75. And HB 2048 does not apply extraterritorially. For starters, a statute is presumed to have no extraterritorial effect. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 117 (2013). And the Oklahoma Supreme Court has adopted that presumption for Oklahoma law. *See Continental Res., Inc. v. Wolla Oilfield Servs., LLC*, 510 P.3d 175, 181 (Okla. 2022). Absent an "express"

indication to the contrary, an Oklahoma statute does not "include an extraterritorial application." *Id.* HB 2048 does not include an express statement of extraterritorial effect, so any Oklahoma court applying the law would not apply it extraterritorially.

Regardless, Novartis's description of the effect of HB 2048 is skewed. HB 2048 does not purport to regulate directly transactions that occur wholly outside Oklahoma and involve individuals unconnected to Oklahoma. Instead, HB 2048 only affects Novartis if it restricts the delivery of 340B drugs to covered entities and their pharmacies *in Oklahoma*. The only transactions implicated by the law are purchases made by Oklahoma entities that will involve delivery within Oklahoma. OKLA. STAT. tit. 36, § 5401(3) (defining pharmacy to mean "a pharmacy licensed by the Oklahoma State Board of Pharmacy"). The fact that Novartis uses an intermediary that ultimately sells the drug to covered entities is immaterial. HB 2048 only affects those interactions if Novartis's contracts with another entity prohibit that third party from delivering Novartis's 340B drugs to Oklahoma covered entities' contract pharmacies. The only transactions implicated by HB 2048 are those that have a direct connection to Oklahoma. *See Bailey*, 2025 WL 595189, at *5 (a similar state law "does not directly regulate transactions taking place wholly outside the state involving individuals having no connection with [the state]"). Moreover, it is Novartis that must "offer" Oklahoma covered entities the 340B discount, 42 U.S.C. § 256b(a)(1), and Novartis that would impose delivery restrictions.

Novartis's attempts to analogize to *Association for Accessible Medicines v. Ellison*, 140 F.4th 957 (8th Cir. 2025), and *Association for Accessible Medicines v. Frosh*, 887 F.3d 664 (4th Cir. 2018), falter because Oklahoma law operates differently than the statutes at issue in those cases. Doc. 16 at 28–29. *Ellison* involved a Minnesota attempt to forbid manufacturers from implementing

"an excessive price increase" on the sale of generic drugs "sold, dispensed, or delivered to any consumer in the state." 140 F.4th at 959 (quoting MINN. STAT. § 62J.842 subd. 1.). Minnesota conceded "that a Colorado manufacturer would be penalized if it sold drugs to a New Jersey distributor at prices above those proscribed by the Act and those drugs ended up in Minnesota." *Id.* at 960. The contrast with Oklahoma law is stark. The Minnesota law "controll[ed] prices" and triggered penalties for out-of-state manufacturers if their drugs unintentionally ended up being sold downstream within Minnesota. *Id.* In Oklahoma, manufacturers could only be punished for taking steps to restrict the delivery of drugs purchased by Oklahoma covered entities. As *Frosh* involved a "nearly identical" law as Minnesota's, the same analysis applies. *Id.*

More fundamentally, Novartis's extraterritorial argument is flawed because HB 2048 is not a drug-pricing law. Again, there is no per se rule prohibiting enforcement of state laws that merely "have the practical effect of controlling extraterritorial behavior." *Nat'l Pork Producers Council*, 598 U.S. at 373–75. After all, many state laws "have the practical effect of controlling" behavior outside the state. *Id.* at 374. For example, state income tax laws and environmental laws are often "decisive" for businesses determining where to locate their headquarters or manufacturing. *Id.* Trying to get around this, Novartis cites to the Tenth Circuit's statement that extraterritoriality occurs when a state law is "(1) a price control or price affirmation regulation, (2) linking in-state prices to those charged elsewhere, with (3) the effect of raising costs for out-of-state consumers or rival businesses." *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1173 (10th Cir. 2015). Novartis's argument fails at the first step. HB 2048 is not a price control—not even close. The 340B Program price is set at the federal level. 42 U.S.C. §

33

256b(a)(1). And HB 2048 does not affect that price. It only forbids drug manufacturers from restricting covered entities from receiving 340B discounted drugs at outside pharmacies or imposing onerous conditions in order for covered entities to receive 340B discounted drugs at those locations. Accordingly, as multiple courts have found when examining similar laws, Oklahoma's law does not operate unlawfully extraterritorially. *See, e.g.*, *Fitch I*, 2024 WL 3277365, at *12–13; *Skrmetti*, 2025 WL 1805271, at *22–24; *Bailey*, 2025 WL 595189, at *5.

**2. HB 2048 does not discriminate against out-of-state commerce.**

The antidiscrimination principle is the dormant Commerce Clause's core. *Nat'l Pork Producers Council*, 598 U.S. at 369. Modern dormant Commerce Clause jurisprudence "is driven by concern about 'economic protectionism, that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Dep't of Rev. of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–274, (1988)). Crucially, the clause protects against discrimination against "substantially similar entities." *Id.* at 342–43. In other words, a state may not pass laws that "advantage in-state firms or disadvantage out-of-state rivals." *Nat'l Pork Producers Council*, 598 U.S. at 370. That has not occurred here.

First, HB 2048 applies to in- and out-of-state manufacturers alike. Although Novartis may be an out-of-state company, Oklahoma is home to pharmaceutical manufacturers. *See* CYTOVANCE BIOLOGICS, https://cytovance.com/ (last visited Aug. 14, 2025) (company located in Oklahoma City at "the heart of a flourishing $7 billion biotechnology community"); PHARMCHOICES, *Full List of Pharm. Companies in Oklahoma (2024)*, https://pharmchoices.com/biotech-pharmaceutical-companies-in-oklahoma/ (last visited

Aug. 14, 2025). As HB 2048 applies equally to manufacturers located in and out of Oklahoma, it does not discriminate against out-of-state interests.

Second, Novartis's claim that the law privileges "in-state hospitals and pharmacies" at the expense of "out-of-state manufacturers," Doc. 16 at 30, suffers from the flaw that those entities are not competitors or similarly situated. Hospitals and pharmacies perform different services and have different competitors than manufacturers do. They are not substantially similar. *Bailey*, 2025 WL 595189, at *4. As one federal district court has observed, the dormant Commerce Clause does not authorize courts to merely "review[] the effects [on an industry] from an in-state or out-of-state vantage point" to determine whether a state law disadvantages certain out-of-state entities. *Id.* Rather, it requires a comparison of "substantially similar entities" to determine whether the Constitution has been violated. *Id.* Where as here, like is treated alike, there is no discrimination against interstate commerce.

The cases Novartis cites to avoid this conclusion, Doc. 16 at 31, only serve to underscore the strained nature of its discrimination claim. For example, in *Energy Michigan, Inc. v. Michigan Public Service Commission*, 126 F.4th 476 (6th Cir. 2025), the Sixth Circuit enjoined a state law that engaged in "facial discrimination" by requiring energy suppliers "to procure some amount of its total [energy] capacity from within the confines of Michigan's lower peninsula." 126 F.4th at 485, 491. Unlike here, that law straightforwardly benefited in-state producers of energy at the expense of out-of-state producers. Similarly, *General Motors Corporation v. Tracy*, 519 U.S. 278 (1997), supports the conclusion that Oklahoma pharmacies and healthcare providers are not substantially similarly situated to drug manufacturers. In *Tracy*, the Supreme Court considered whether an Ohio tax law discriminated against out-of-state

retailers (like General Motors) by exempting public utilities from paying sales and use taxes on natural gas purchases. *Id.* at 281–82. But even though General Motors and Ohio's utilities competed within one of the two relevant markets, the Supreme Court still declined to view them as substantially similar entities for purposes of the dormant Commerce Clause. *Id.* at 303–04. Here, covered entities and their pharmacies are not even directly competing with drug manufacturers to purchase or sell drugs. Instead, the covered entities purchase drugs from the manufacturers and then sell them to patients. Together, these cases caution against comparing apples to oranges. HB 2048 does not discriminate against interstate commerce.[9]

### 3. HB 2048 does not excessively burden interstate commerce.

If a plaintiff can demonstrate that a challenged law imposes substantial burdens on interstate commerce, the next step is for the court to employ the *Pike* balancing framework to determine if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 142 (1970). This doctrine, however, rests on shaky footing. In *Pork Producers*, three justices contended that the *Pike* test did not "authoriz[e] judges to strike down duly enacted state laws . . . based on nothing more than their own assessment of the relevant law's 'costs' and 'benefits.'" 598 U.S. at 380. As these justices acknowledged, policy choices between incommensurable goods "belong to the people and their elected representatives." *Id.* at 382. While *Pike* balancing may have survived

---

[9] Novartis cries "animus" based on the statement of two legislators. Doc. 16 at 30–31. Read in full, though, the legislators express frustration that the Governor vetoed a bill designed to assist providers serving Oklahoma's vulnerable communities. And their concern about manufacturers restricting access to contract pharmacies was shared by HHS—hardly an entity prejudiced against interstate commerce. *Sanofi*, 58 F.4th at 701. Regardless, "the statements of a few legislators concerning their motives . . . is a reed too thin to support invalidation of a statute." *Citizens for Const. Integrity v. United States*, 57 F.4th 750, 768 (10th Cir. 2023).

*Pork Producers*, the test only permits enjoining laws "where the infraction is clear" to ensure that it is not merely substituting its own judgment for that of the people's duly elected representatives. *Nat'l Pork Producers Council*, 598 U.S. at 390.

Regardless, Novartis has not shown a substantial burden on interstate commerce. Novartis claims (1) that bargaining power has shifted to in-state industries at the expense of out-of-state manufacturers, and (2) that it is subject to a patchwork of state laws. Doc. 16 at 33. Neither of those are substantial burdens. It is simply not true that HB 2048 has shifted bargaining power. There is no bargaining. Under the 340B Program, manufacturers must offer their drugs at or below the price set by HHS. HB 2048 does not affect that price. It only prohibits manufacturers from refusing to deliver those drugs to contract pharmacies. And Oklahoma law has not created a patchwork of requirements. Novartis cites a litany of states that enacted similar laws. But those laws would exist with or without HB 2048. (If anything, Novartis has shown just how commonplace Oklahoma's law is.) In any event, it is not clear how delivering 340B drugs to contract pharmacies poses an administrative burden. Elsewhere, Novartis admits it already ships drugs to pharmacies. Doc. 16 at 32. Novartis does not explain how also shipping drugs purchased by covered entities to pharmacies would substantially burden interstate commerce. *Pike* requires much more.

Similarly, Novartis fails to address the local benefits provided by HB 2048. That failure alone should preclude injunctive relief. And the local benefits are sizable. "340B hospitals perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n*, 596 U.S. at 738; Ex. 2, Decl. of Alan Lovelace, ¶ 5 ("In 2024, Stillwater Medical recorded uncompensated care of over $48 [million]."). The

340B program makes covered entities "profitable," thereby "stretch[ing] scarce [f]ederal resources as far as possible" to "provide more services to a larger population of underserved patients." *Genesis Health Care, Inc.*, 701 F. Supp. 3d at 316. HB 2048 supports Oklahoma covered entities with their mission to provide accessible healthcare to underserved patients. Ex. 1., Decl. of Alexis Ngo, ¶ 5 (because of 340B program funds, Integris Baptist Medical Center is able to operate the Nazih Zuhdi Transplant Institute at a financial loss); Ex. 3., Decl. of Steve Hartgraves, ¶¶ 7–8 (Jackson County Memorial Hospital uses 340B savings to "expand and improve the services it provides its patients."). By allowing covered entities to contract with outside pharmacies, HB 2048 ensures that patients can access prescription medicine even if they do not live near the covered entity where they receive healthcare. And by requiring manufacturers to deliver 340B drugs to contract pharmacies, the covered entity is able to receive the 340B discount when its patients elect to fill prescriptions at a pharmacy not owned by the covered entity—thereby providing these hospitals and healthcare providers with more resources to care for rural Oklahoma. Ex. 2, ¶¶ 5–7; Ex. 3, ¶¶ 6–7. Those benefits substantially outweigh the purported burden on interstate commerce.

In sum, on one side of the scale Novartis claims that it will have to provide discounts on more drugs and deal with (vague) administrative costs. On the flip side, Oklahoma healthcare patients will have access to more healthcare services. The outcome is clear. The alleged burden on interstate commerce does not outweigh the local benefits.

## II.    THE OTHER EQUITABLE FACTORS COUNSEL AGAINST INJUNCTIVE RELIEF.

Novartis's failure to establish a likelihood of success is enough to deny an injunction. In addition, a preliminary injunction would irreparably harm the State, its citizens, and hurt

the public interest. Blocking a "duly enacted [state law] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). The harm is especially severe here because the Act serves compelling public interests in protecting health and safety—areas that fall in the heartland of the State's sovereign interests.

Enjoining the Act would also irreparably harm the State's vulnerable populations and hospitals. *See, e.g.*, Alaa Ziad Haidar, *Recent 340b Contract Pharmacy Troubles and the Necessary Solution*, 33 HEALTH LAW. 34, 34 (2020) (describing the benefits of contract pharmacies). Allowing covered entities to contract with pharmacies to receive 340B drugs enables Oklahoma hospitals to continue to provide valuable services to rural communities. Ex. 1, ¶ 5, Ex. 2, ¶¶ 5–6; Ex. 3, ¶¶ 6–7. Without HB 2048, rural Oklahomans would likely lose access to certain services that can only be offered by rural hospitals using the money from the 340B program. For example, Stillwater Medical Center Authority has lost over $3 million annually since manufacturers began restricting the use of contract pharmacies. Ex. 2, ¶ 7. This has forced it to consider closing primary clinics located in rural areas. *Id.*

Novartis argues that it will be irreparably harmed by complying with an allegedly unconstitutional law. Doc. 16 at 34. But that argument falls with its merits case. Novartis also complains that HB 2048 will cost it "millions in discounts." *Id.* at 35. But the Act does not require Novartis to provide discounted prices. Any harm from the discounts would stem from the 340B Program itself—which is where Novartis's real complaint appears to lie. *See supra* n.7. And whatever unrecoverable compliance costs Novartis allege will result from HB 2048 are outweighed by the benefits they receive from the 340B Program. In any case, the harm to the State and the public outweighs Novartis's financial—and hypothetical—costs.

## III.    NOVARTIS'S PROPOSED INJUNCTION IS OVERBROAD.

Novartis asks for a sweeping injunction "enjoining enforcement of H.B. 2048 pending a decision on the merits." Doc. 16 at 4. By the terms of the request, that relief would not be confined to Novartis, and would instead operate as a facial injunction against the law's application to all potential parties. Such an injunction would be improper. The Supreme Court has "made facial challenges hard to win," *Moody*, 603 U.S. at 723, and it has recently made clear that district courts should not issue injunctions "broader than necessary to provide complete relief to each plaintiff," *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562–63 (2025). An injunction limited to Novartis would afford Novartis complete relief.

Similarly, Novartis does not analyze severability, even though HB 2048 states that "[i]f any provision of this act . . . is held to be unconstitutional, the remainder of this act . . . shall not be affected thereby." OKLA. STAT. tit. 36, § 5405(D). If this Court were to determine that portions of the Act are unconstitutional, they should be severed from the rest of the statute. The purpose of the severability analysis "is to determine whether non-offending statutory provisions may survive as valid after the clauses rejected as invalid are separated from the whole." *Fent v. Contingency Rev. Bd.*, 163 P.3d 512, 523 (Okla. 2017). "Survival of untainted statutory provisions that remain is appropriate when the valid and voided (as unconstitutional) provisions are not so 'inseparably connected with and so dependent upon' each other that the surviving provisions would not have otherwise been enacted." *Id.* at 524. Here, the various provisions all operate independently and could be severed.

## <u>CONCLUSION</u>

Oklahoma respectfully requests that this Court deny Novartis's Motion.

Respectfully submitted,

*s/ Will Flanagan*

GARRY M. GASKINS, II, OBA 20212
  *Solicitor General*
ZACH WEST, OBA 30768
  *Director of Special Litigation*
WILL FLANAGAN, OBA 35110
  *Assistant Solicitor General*
ADDISON GAUT, OBA 36457
  *Assistant Attorney General*

OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
William.Flanagan@oag.ok.gov
Addison.Gaut@oag.ok.gov

*Counsel for Defendant*