## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

<table>
<tr><td>

NOVARTIS PHARMACEUTICALS
CORPORATION,

    *Plaintiff,*

       *v.*

GENTNER DRUMMOND, in his official
capacity as ATTORNEY GENERAL OF
OKLAHOMA,

    *Defendant.*

</td><td>

Case No. 5:25-cv-00727-PRW

</td></tr>
</table>

### BRIEF OF *AMICI CURIAE* AMERICAN HOSPITAL ASSOCIATION, 340B HEALTH, OKLAHOMA HOSPITAL ASSOCIATION, AND AMERICAN SOCIETY OF HEALTH-SYSTEM PHARMACISTS <u>IN SUPPORT OF DEFENDANT</u>

Daniel G. Webber, Jr., OBA #16332
Patrick R. Pearce, Jr., OBA #18802
RYAN WHALEY
400 North Walnut Avenue
Oklahoma City, OK 73104
Tel: (405) 239-6040
Fax: (405) 239-6766
dwebber@ryanwhaley.com
rpearce@ryanwhaley.com

William B. Schultz*
Margaret M. Dotzel*
Alyssa M. Howard*
Aaron Chou*
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8106
wschultz@zuckerman.com
mdotzel@zuckerman.com
ahoward@zuckerman.com
achou@zuckerman.com

*\* pro hac vice motion filed
contemporaneously*

## <u>TABLE OF CONTENTS</u>

INTEREST OF *AMICI CURIAE* ....................................................................... 1

INTRODUCTION .............................................................................................. 2

FACTUAL BACKGROUND ON THE IMPORTANCE OF CONTRACT PHARMACY
ARRANGEMENTS IN OKLAHOMA ................................................................ 5

ARGUMENT ..................................................................................................... 8

I.  Novartis IS NOT LIKELY to Succeed ON THE MERITS. ......................... 8

    A.  Novartis's Supremacy Clause Claims Fail Because H.B. 2048 Is Not
    Preempted. .............................................................................................. 8

        1.  *Congress did not create or occupy a field when it established the 340B*
           *program.* ........................................................................................ 9

        2.  *H.B. 2048 does not conflict with the 340B statute.* .................................. 11

           a.  H.B. 2048 regulates delivery, not price. ............................................ 13

           b.  H.B. 2048 does not interfere with 340B's remedial regime. .............. 17

    B.  H.B. 2048 Is Not an Impermissible Extraterritorial Regulation. ....................... 18

II.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST SUPPORT DENYING
    AN INJUNCTION. ................................................................................. 22

CONCLUSION ................................................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

## CASES

*AbbVie Inc. v. Fitch*,
  No. 1:24-cv-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024)..........5, 15

*Am. Hosp. Ass'n v. Becerra*,
  596 U.S. 724 (2022)....................................................................................................6, 23

*Arizona v. United States*,
  567 U.S. 387 (2012)...........................................................................................................9

*Astra USA, Inc. v. Santa Clara County, Cal.*,
  563 U.S. 110 (2011).........................................................................................................11

*AstraZeneca Pharms. LP v. Bailey*,
  No. 2:24-cv-4143-MDH, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025) ........................5

*AstraZeneca Pharms. LP v. Fitch*,
  No. 1:24-cv-196-LG-BWR, 2024 WL 5345507 (S.D. Miss. Dec. 23, 2024) ..........5, 10

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
  520 U.S. 564 (1997).........................................................................................................13

*Chamber of Com. of U.S. v. Whiting*,
  563 U.S. 582 (2011)...................................................................................................13, 17

*Chinatown Neighborhood Ass'n v. Harris*,
  794 F.3d 1136 (9th Cir. 2015) ........................................................................................12

*Cipollone v. Liggett Grp., Inc.*,
  505 U.S. 504 (1992)...........................................................................................................9

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
  536 U.S. 424 (2002)...........................................................................................................9

*Cont'l Res., Inc. v. Wolla Oilfield Servs., LLC*,
  510 P.3d 175 (Okla. 2022)...............................................................................................21

*Conway v. United States*,
  997 F.3d 1198 (Fed. Cir. 2021) .......................................................................................12

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000)...........................................................................................................9

*CTS Corp. v. Dynamics Corp. of Am.*,
    481 U.S. 69 (1987) .................................................................................. 13

*Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*,
    126 F.4th 476 (6th Cir. 2025) ................................................................. 19

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) .................................................................................. 13

*In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Prac. Litig.*,
    960 F.3d 1210 (10th Cir. 2020) .............................................................. 11

*Iowa, Chi. & E. R.R. Corp. v. Washington Cnty.*,
    384 F.3d 557 (8th Cir. 2004) ................................................................. 12

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ............................................................................ 5, 9

*Murphy v. NCAA*,
    584 U.S. 453 (2018) ................................................................................ 10

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
    413 U.S. 405 (1973) ................................................................................ 10

*National Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) .................................................................... 19, 20, 21

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................ 22

*Novartis Pharms. Corp. v. Bailey*,
    No. 2:24-cv-04131-MDH, 2025 WL 489881 (W.D. Mo. Feb. 13, 2025) ............... 5, 10

*Novartis Pharms. Corp. v. Bailey*,
    No. 2:24-cv-04131-MDH, 2025 WL 595189 (W.D. Mo. Feb. 24, 2025) ..................... 19

*Novartis Pharms. Corp. v. Fitch*,
    738 F. Supp. 3d 737 (S.D. Miss. 2024) ................................................... 5, 10

*Novartis Pharms. Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024) ............................................................. 3, 11

*Novartis Pharms. Corp. v. Johnson*,
    No. 21-5299, 2022 WL 2072941 (D.C. Cir. June 8, 2022) ............................. 3

*Paul v. Monts*,
  906 F.2d 1468 (10th Cir. 1990) ................................................................. 12

*PhRMA v. Fitch*,
  No. 1:24-cv-160-HSO-BWR, 2024 WL 3277365 (S.D. Miss. July 1, 2024).... 14, 19, 21

*PhRMA v. McClain*,
  95 F.4th 1136 (8th Cir.), *cert. denied*, 145 S. Ct. 768 (2024)................................*passim*

*PhRMA v. Murrill*,
  No. 6:23-cv-997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) .................. 5, 11, 12, 14

*PhRMA v. Walsh*,
  538 U.S. 644 (2003) .................................................................................... 9

*Pike v. Bruce*,
  397 U.S. 137 (1970) .................................................................................... 21

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*,
  699 F.3d 962 (7th Cir. 2011) ..................................................................... 12

*Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696 (3d Cir.
  2023) ........................................................................................................... 3

*Schafer v. Am. Cyanamid Co.*,
  20 F.3d 1 (1st Cir. 1994) ............................................................................ 13

## STATUTES

25 Okla. Stat. §§ 1312–1313 ......................................................................... 17

42 U.S.C. §§ 256b(d)(2)(B)(iv) & (3) ............................................................ 18

51 Okla. Stat. § 24A.5 .................................................................................... 17

63 Okla. Stat. § 2-302(D) ............................................................................... 17

H.B. 2048 § 4(A) ......................................................................................... 4, 20

H.B. 2048 § 5(A)–(B) ...................................................................................... 17

Okla. Stat. tit. 36, § 5403(A) ........................................................................... 4

**OTHER AUTHORITIES**

340B Health, *Drugmakers Pulling $8 Billion Out of Safety-Net Hospitals: More Expected as Growing Number Impose or Tighten 340B Restrictions* 2, https://www.340bhealth.org/files/Contract_Pharmacy_Financial_Impact _Report_July_2023.pdf...................................................................................... 8

340B Health, *Restrictions on 340B Contract Pharmacy Increase Drug Company Profits but Lead to Lost Savings, Patient Harm, and Substantial Burden for Safety-Net Hospitals* 8, https://www.340bhealth.org/files/Contract_Pharmacy_Survey_Report _March_2023.pdf. ................................................................................... 6, 8

Adam J. Fein, Drug Channels Institute, *Insurers + PBMs + Specialty Pharmacies + Providers: Will Vertical Consolidation Disrupt Drug Channels in 2020?* (Dec. 12, 2019), https://www.drugchannels.net/2019/12/insurers-pbms-specialty-pharmacies.html; Specialty Drug Coverage and Reimbursement in Medicaid, HHS Office of Inspector General, https://oig.hhs.gov/reports-and-publications/workplan/summary/wp-summary-0000255.asp ........................................................................................ 8

Adam J. Fein, Drug Channels Institute, *The 2022 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers* (Mar. 2022). https://drugchannelsinstitute.com/files/2022-PharmacyPBM-DCI-Overview.pdf ......... 8

DRH Health, *Value of the 340B Drug Pricing Program at DRH Health*, https://www.duncanregional.com/about-the-hospital/340b-community-benefit/ ..... 7, 13

Letter from Dep't of Health & Hum. Servs., Health Resources & Servs. Admin. Administrator C. Johnson to AbbVie, Inc. Vice Pres., U.S. Market Access C. Compisi (Oct. 17, 2022), https://www.hrsa.gov/sites/default/files/hrsa/opa/programintegrity/hrsa-letter-abbvie-covered-entities.pdf...................................................................................... 2

*Novartis Annual Report 2024*, Novartis Global Communications (Jan. 31, 2024), https://www.novartis.com/sites/novartis_com/files/novartis-annual-report-2024.pdf .. 22

**REGULATIONS**

HRSA, *Final Rule, 340B Drug Pricing Program; ADR Regulation*, 89 Fed. Reg. 28,643, 28,643 (Apr. 19, 2024)................................................................................... 13

## INTEREST OF *AMICI CURIAE*

The *amici curiae* filing this brief are: American Hospital Association, 340B Health, Oklahoma Hospital Association, and American Society of Health System Pharmacists (collectively, "*Amici*"). *Amici* and their members are committed to improving the health of the communities they serve through the delivery of high-quality, efficient, and accessible health care. The discounts provided by the 340B program are essential to achieving this goal. *Amici* therefore have a strong interest in the success of Oklahoma's legislative efforts to protect the 340B program.

The **American Hospital Association** (AHA) represents nearly 5,000 hospitals, healthcare systems, and other healthcare organizations nationwide. AHA members are committed to helping ensure that healthcare is available to and affordable for all Americans. AHA promotes the interests of its members by participating as *amicus curiae* in cases with important and far-ranging consequences, including cases related to the 340B program.

**340B Health** is a national, not-for-profit organization founded in 1993 to advocate for 340B hospitals—a vital part of the nation's healthcare safety net. 340B Health represents over 1,600 public and private nonprofit hospitals and health systems participating in the 340B program.

The **Oklahoma Hospital Association** (OHA) is the voice of hospitals in Oklahoma. Established in 1919, the OHA is a private, non-profit trade association that represents more than 135 hospitals and health care entities across the state. OHA's primary objective is to

promote the welfare of the public by leading and assisting its members in the provision of better health care and services for all people.

The **American Society of Health-System Pharmacists** (ASHP) is the largest association of pharmacy professionals in the United States. ASHP advocates and supports the professional practice of pharmacists in hospitals, health systems, ambulatory care clinics, and other settings spanning the full spectrum of medication use. For over 80 years, ASHP has championed innovation in pharmacy practice, advanced education, and professional development, and has served as a steadfast advocate for members and patients.

## INTRODUCTION

Five years ago, nearly 40 drug companies, including Plaintiff Novartis Pharmaceuticals Corporation ("Novartis"), broke with decades of precedent and suddenly refused to ship drugs purchased by 340B hospitals to contract pharmacies. The contract pharmacy arrangements that drug companies like Novartis honored for almost thirty years helped sustain hospitals and their patients. The federal government determined that this was unlawful and sought to require manufacturers to continue delivering these drugs to contract pharmacies on the same terms to which they delivered those drugs to 340B in-house hospital pharmacies.[1]

"Section 340B, 42 U.S.C. § 256b, requires pharmaceutical manufacturers to offer discounted drugs to covered entities for purchase. It is *silent* as to whether manufacturers

---

[1] *See, e.g.*, Letter from Dep't of Health & Hum. Servs., Health Resources & Servs. Admin. Administrator C. Johnson to AbbVie, Inc. Vice Pres., U.S. Market Access C. Compisi (Oct. 17, 2022), https://www.hrsa.gov/sites/default/files/hrsa/opa/programintegrity/hrsa-letter-abbvie-covered-entities.pdf.

must deliver those drugs to contract pharmacies." Br. for Appellee Novartis Pharms. Corp. at 4, *Novartis Pharms. Corp. v. Johnson*, No. 21-5299, 2022 WL 2072941 (D.C. Cir. June 8, 2022).[2] Novartis submitted these exact words to the United States Court of Appeals for the D.C. Circuit only three years ago when faced with the federal government's attempt to penalize the company's harsh restrictions on contract pharmacy arrangements.

In lawsuit after lawsuit, at no point did Novartis or its sister drug companies describe their contract pharmacy policies as price restrictions. Instead, they insisted that their policies were permissible because (1) they were *delivery* restrictions, and (2) the 340B statute had absolutely nothing to say about *delivery*. Those arguments carried the day. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024) (Section 340B is "silent about delivery conditions"); *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 703 (3d Cir. 2023) (Section 340B's "text is silent about delivery").

Like many other states, Oklahoma has filled the federal statutory gap that drug companies spent years fighting for by requiring drug companies to ship drugs to 340B entities' contract pharmacies on the same terms as they ship those drugs to 340B entities' in-house pharmacies. Faced with the drug industry's unprecedented assault on Oklahoma's health care safety net and the acknowledged gap in federal law, the Oklahoma legislature enacted House Bill 2048 ("H.B. 2048"). H.B. 2048 does only what Novartis and the federal

---

[2] *See also* AstraZeneca Opening Br. at 4, *AstraZeneca Pharms. L.P. v. U.S. Dep't of Health & Hum. Servs.*, No. 22-01676 (3d Cir. July 21, 2022) ("Section 340B is 'silent' on the role of contract pharmacies under the program. That silence means the statute does not impose contract pharmacy obligations on manufacturers.").

courts said the *federal* law did not do: regulate the delivery of 340B drugs. H.B. 2048 § 4(A), codified at Okla. Stat. tit. 36, § 5403(A) states that "[a] manufacturer shall not deny, restrict, prohibit, or otherwise interfere with . . . the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity, unless such receipt is prohibited by [HHS]." Similarly, H.B. 2048 § 4(B) states that "[a] manufacturer shall not interfere with a pharmacy contracted with a 340B entity." Together, these provisions prohibit manufacturers from preventing covered entities in Oklahoma from being able to contract with outside pharmacies to provide their patients 340B discounted drugs.

Now comes the whiplash. Banking its prior win, Novartis now claims in its Complaint that H.B. 2048 "is a state drug-pricing statute" whose enforceability "is solely an issue of price, not delivery." Compl., ECF No. 1 ¶ 13. Even though Oklahoma has legislated in precisely the area that Novartis successfully insisted was *not* addressed under federal law—the delivery of 340B drugs—the company has reversed course in this litigation to claim that H.B. 2048 is preempted by federal law. And as part of that about-face, Novartis now insists that states cannot fill the federal statutory gap that drug companies (including Novartis) spent years fighting for.

This history is important—and not just because it exposes the hypocrisy in Novartis's legal position. It also serves as a reminder of *why* Oklahoma chose to step into the federal statutory void. Put simply, Oklahoma acted because drug companies and the federal courts all but invited it to do so.

The primary issue here is whether Oklahoma, exercising its historic police power over health and safety, can fill the gap in the federal 340B statute and regulate the delivery

of 340B drugs (purchased by 340B hospitals) to contract pharmacies. It can. Numerous district courts have said so,[3] as has the Eighth Circuit in the only Court of Appeals decision to date addressing a drug industry challenge to a state contract pharmacy statute. *See PhRMA v. McClain*, 95 F.4th 1136, 1143–45 (8th Cir.), *cert. denied*, 145 S. Ct. 768 (2024).

At bottom, Novartis's attack on H.B. 2048 is really an attack on federalism itself. Novartis tries to transform an acknowledged federal statutory silence into a reason to displace "the historic primacy of state regulation of matters of health and safety." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). That is not the law, and each of Novartis's claims seeking to undermine Oklahoma's lawful exercise of traditional state authority should be rejected.

## FACTUAL BACKGROUND ON THE IMPORTANCE OF CONTRACT PHARMACY ARRANGEMENTS IN OKLAHOMA

Novartis spends page after page maligning the 340B program and the covered entities that rely on it. Needless to say, it is in its financial interest to do so. For Novartis, every 340B drug it refuses to deliver to an Oklahoma contract pharmacy is an additional profit line on its balance sheets.

But this is not how the Supreme Court has viewed the program. As Justice Kavanaugh wrote for a unanimous Supreme Court just a few years ago: "340B hospitals

---

[3] *See AstraZeneca Pharms. LP v. Bailey*, No. 2:24-cv-4143-MDH, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025); *Novartis Pharms. Corp. v. Bailey*, No. 2:24-cv-04131-MDH, 2025 WL 489881 (W.D. Mo. Feb. 13, 2025); *AstraZeneca Pharms. LP v. Fitch*, No. 1:24-cv-196-LG-BWR, 2024 WL 5345507 (S.D. Miss. Dec. 23, 2024); *PhRMA v. Murrill*, No. 6:23-cv-997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024); *AbbVie Inc. v. Fitch*, No. 1:24-cv-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024); *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024).

perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738 (2022). And more significant here, the Oklahoma legislature, with an unbiased interest in protecting its citizens, hospitals, and pharmacies, shares the Supreme Court's view of the Program. When enacting H.B. 2048, the Oklahoma legislature rejected the drug companies' efforts to denigrate the 340B program and those who rely on it.

For good reason. The contract pharmacy arrangements that Novartis honored for almost thirty years helped sustain hospitals and their patients. Nationwide, a quarter of hospitals' 340B benefit comes from drugs dispensed at contract pharmacies.[4] The drug industry's efforts to stop 340B hospitals from relying on contract pharmacies has hurt 340B hospitals and adversely affected their ability to serve Oklahoma's most vulnerable patients.

For example, OU Health uses its 340B savings to maximize the reach and impact of its services and resources. Around 35% of OU Health's patient population are Medicare and Medicaid patients, and in fiscal year 2023, OU Health spent around $600 million in charity care to serve these patients. The 340B savings also enable OU Health to implement community initiatives that directly address its key community health priorities. Among many others, these programs include the Physicians Super Niños Clinic, a pediatric healthcare clinic focused on providing medical care and essential resources to underserved children and families, particularly within the Latino community, and the Street Medicine

---

[4] 340B Health, *Restrictions on 340B Contract Pharmacy Increase Drug Company Profits but Lead to Lost Savings, Patient Harm, and Substantial Burden for Safety-Net Hospitals* 8, https://www.340bhealth.org/files/Contract_Pharmacy_Survey_Report_March_2023.pdf.

Program, an outreach program that provides integrated primary care services to individuals experiencing homelessness. Without the contract pharmacies, OU Health would not be able to provide all its current healthcare and services to underserved and vulnerable individuals in the community.

DRH Health, which operates Duncan Regional Hospital, Jefferson County Hospital, and sixteen other clinics throughout southwest Oklahoma, also uses its 340B benefit to fund services that operate at a loss, including several programs that support behavioral health and primary care access in the communities where it operates.[5] DRH Health also oversees a growing behavioral health service line that provides outpatient addiction and behavioral medicine, an outpatient geriatric outpatient counseling program, and an inpatient geriatric psychiatry program for the region.[6] DRH Health's 340B savings of $2.4 million in fiscal year 2023 were still only a fraction of the total cost of its Uncompensated and Charity Care—an estimated $36.4 million.[7]

Contract pharmacy arrangements are especially important because fewer than half of 340B hospitals operate in-house pharmacies.[8] Even fewer—only one in five 340B hospitals—have in-house "specialty" pharmacies, which many insurers require for the

---

[5] DRH Health, *Value of the 340B Drug Pricing Program at DRH Health*, https://www.duncanregional.com/about-the-hospital/340b-community-benefit/.

[6] *Id.*

[7] *Id.*

[8] 340B Health, *Drugmakers Pulling $8 Billion Out of Safety-Net Hospitals: More Expected as Growing Number Impose or Tighten 340B Restrictions* 2, https://www.340bhealth.org/files/Contract_Pharmacy_Financial_Impact_Report_July_2023.pdf.

dispensing of "specialty" drugs. These drugs are typically used to treat chronic, serious, or life-threatening conditions, and are generally priced much higher than non-specialty drugs.[9] Thus, 340B hospitals typically *must* contract with at least one specialty pharmacy outside of its in-house pharmacy.[10] Denied these and other 340B savings associated with contract pharmacies, 340B hospitals have been forced to cut critical programs and services.[11]

The profitable drug companies' assault on contract pharmacy relationships drastically reduces the savings that Oklahoma's 340B hospitals rely on and jeopardizes the hospitals' ability to provide valuable services to their patients.

## ARGUMENT

**I.    NOVARTIS IS NOT LIKELY TO SUCCEED ON THE MERITS.**

### A.    Novartis's Supremacy Clause Claims Fail Because H.B. 2048 Is Not Preempted.

"The purpose of Congress is the ultimate touchstone of pre-emption analysis." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (internal quotation marks and citation omitted). In every preemption case, "and particularly in those in which Congress

---

[9]    Adam J. Fein, Drug Channels Institute, *Insurers + PBMs + Specialty Pharmacies + Providers: Will Vertical Consolidation Disrupt Drug Channels in 2020?* (Dec. 12, 2019), https://www.drugchannels.net/2019/12/insurers-pbms-specialty-pharmacies.html; Specialty Drug Coverage and Reimbursement in Medicaid, HHS Office of Inspector General, https://oig.hhs.gov/reports-and-publications/workplan/summary/wp-summary-0000255.asp.

[10]    340B Health, *supra* note 4, at 7 (citing Adam J. Fein, Drug Channels Institute, *The 2022 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers* (Mar. 2022). https://drugchannelsinstitute.com/files/2022-PharmacyPBM-DCI-Overview.pdf.

[11]    *Id.*, 340B Health at 2, 8.

has 'legislated in a field which the States have traditionally occupied,'" *Lohr*, 518 U.S. at 485, courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 432 (2002). That is "particularly" true in "matters of health," given "the historic primacy of state regulation" in that area. *Lohr*, 518 U.S. at 485. Novartis has the burden to show that Congress intended to preempt H.B. 2048. *See PhRMA v. Walsh*, 538 U.S. 644, 661–62 (2003). Unlike state laws that intrude into uniquely federal areas such as immigration and foreign relations,[12] H.B. 2048 is presumptively *not* preempted. Novartis therefore must demonstrate Congress's "clear and manifest purpose" to supersede Oklahoma's historic authority to regulate in the public health arena, *Lohr*, 518 U.S. at 485, which it cannot do. This Court should reject both of Novartis's preemption theories—just as the Eighth Circuit and numerous district courts have done with preemption challenges to substantially similar state contract pharmacy statutes.[13]

### 1. Congress did not create or occupy a field when it established the 340B program.

Novartis's field-preemption theory, *see* Pl.'s Brief In Support of Mot. for Prelim. Inj. ("Pl.'s MPI"), ECF No. 16, at 14–18, both misapplies the relevant standard and

---

[12]  *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).

[13]  *See PhRMA v. McClain*, 95 F.4th at 1143–45; *see also, e.g.*, *Novartis v. Fitch*, 738 F. Supp. 3d at 747; *AstraZeneca v. Fitch*, 2024 WL 5345507, at *4–9; *Novartis v. Bailey*, 2025 WL 489881, at *2–4.

mischaracterizes the 340B statute. Field preemption occurs only in narrow circumstances, "when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy v. NCAA*, 584 U.S. 453, 479 (2018) (citation omitted). Indeed, "[t]he subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem." *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415 (1973). Thus, the Supreme Court has "reject[ed] . . . the contention that pre-emption is to be inferred merely from the comprehensive character" of a federal statute. *Id.* If it did, every time Congress created a federal program, it would create an exclusively federal field into which states cannot intrude. But that is not the law. *Id.* And with the 340B program, "a detailed statutory scheme was both likely and appropriate, completely apart from any questions of pre-emptive intent." *Id.* Indeed, the Tenth Circuit has confirmed that there is no evidence that "Congress intended the federal government to exclusively occupy the field of prescription drugs in general." *In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Prac. Litig.*, 960 F.3d 1210, 1225 (10th Cir. 2020).

Novartis's field-preemption theory relies entirely on the (supposed) comprehensiveness of the 340B statute and its dispute-resolution system.[14] *See* Pl.'s MPI

---

[14] Novartis relies on *Astra*, 563 U.S. 110, which does not address preemption. The Western District of Louisiana has persuasively explained why *Astra* is inapposite. *PhRMA v. Murrill*, Nos. 6:23-cv-00997, 6:23-cv-01042, 6:23-cv-01307, 2024 WL 4361597, at *7 (W.D. La. Sept. 30, 2024). Put simply, the *Astra* Court's hesitance to allow "potentially thousands of" private parties to sue to correct "errors in manufacturers' price calculations"

at 15–18; Compl. ¶ 87 (alleging that the "340B statute sets up a pervasive and carefully integrated pricing scheme"). But Novartis is wrong to characterize regulation of the 340B statute as "pervasive." Pl.'s MPI at 16. Novartis should know this: Novartis and many other drug companies vehemently argued, and convinced federal courts, that the 340B statute is "silent about delivery conditions." *Novartis v. Johnson*, 102 F.4th at 460. And for precisely that reason, the Eighth Circuit rejected a field preemption challenge to a state contract pharmacy statute substantially similar to H.B. 2048. *See PhRMA v. McClain*, 95 F.4th at 1143 ("Congress's decision not to legislate the issue of pharmacy distribution indicates that Section 340B is not intended to preempt the field."). This Court should follow the Eighth Circuit's reasoning and reject Novartis's field preemption theory.[15]

### 2.    *H.B. 2048 does not conflict with the 340B statute.*

Although framed as a separate cause of action, "[i]n arguing conflict preemption, [Novartis] re-urge[s] many of the same arguments [it] urge[d] with respect to [its] field preemption claims." *PhRMA v. Murrill*, 2024 WL 4361597, at *8. The Court therefore should reject them, too. *E.g.*, *PhRMA v. McClain*, 95 F.4th at 1144–45 (rejecting similar conflict preemption theories).

---

has no bearing on whether *States* can fill gaps in federal law regarding the delivery of 340B drugs. *Astra*, 563 U.S. at 114. Indeed, the only mention of preemption in *Astra* is in a footnote concerning a different federal program, the Medicaid Drug Rebate Program. *Id.* at 120 n.5.

[15] In addition, and as discussed in more detail below, *see infra* at pp. 17–18, HRSA's exclusive authority to resolve certain disputes arising under the 340B statute itself is no reason to doubt Oklahoma's authority to impose and enforce *its own* requirements—which, as Novartis repeatedly emphasizes, are *different* from the requirements of the 340B statute. *See, e.g.*, Pl.'s MPI at 22–26.

In essence, Novartis tries to transform the federal statute's silence about delivery into an intentional congressional decision to preempt state regulation. That is not the law in this Circuit. *See Paul v. Monts*, 906 F.2d 1468, 1475 n.8 (10th Cir. 1990) ("Congressional silence will not be presumed to mandate preemption. On the contrary, it will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intent to do so.") (quotation marks omitted). Nor is it the law in other Circuits.[16]

A proper conflict preemption analysis requires parties to demonstrate that the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). This is a "high

---

[16] *See e.g.*, *Conway v. United States*, 997 F.3d 1198, 1211 (Fed. Cir. 2021) ("Congress' silence is powerful evidence that Congress did not intend to preempt state law fixing creditors' rights during insolvency." (citation and internal quotation marks omitted)); *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1143 (9th Cir. 2015) ("Silence, without more, does not preempt—'a clear and manifest purpose of pre-emption is always required.'"); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 985 (7th Cir. 2011) ("As we have noted, congressional and regulatory silence usually *defeats* a claim of preemption, not the other way around.") (emphasis in original); *Iowa, Chi. & E. R.R. Corp. v. Washington Cnty.*, 384 F.3d 557, 561 (8th Cir. 2004) ("ICCTA did not address these problems. Its silence cannot reflect the requisite clear and manifest purpose of Congress to preempt traditional state regulation of public roads and bridges that Congress has encouraged in numerous other statutes. (quotation marks omitted)); (citation and internal quotation omitted); *Schafer v. Am. Cyanamid Co.*, 20 F.3d 1, 6 (1st Cir. 1994) ("Pre-emption law, for example, cautions us against finding that a congressional act pre-empts a state law through silence."); *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 616 (1997) (Thomas, J., dissenting) ("Even where Congress has legislated in an area subject to its authority, our pre-emption jurisprudence explicitly rejects the notion that mere congressional silence on a particular issue may be read as preempting state law.").

threshold," *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011), and Novartis comes nowhere close to meeting it.

The 340B statute was passed to help covered healthcare providers "reach[] more eligible patients and provid[e] more comprehensive services." HRSA, *Final Rule, 340B Drug Pricing Program; ADR Regulation*, 89 Fed. Reg. 28,643, 28,643 (Apr. 19, 2024) (hereinafter, "ADR Rule"). Oklahoma's H.B. 2048, in turn, enables 340B providers to continue to benefit from contract pharmacy arrangements and thereby offer expanded healthcare to their patients.[17] Thus, not only does H.B. 2048 not stand as an obstacle to the purposes of the 340B statute, "it does the opposite: [H.B. 2048] assists in fulfilling the purpose of 340B." *PhRMA v. McClain*, 95 F.4th at 1144–45; *see also CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 83 (1987) (rejecting conflict preemption challenge because the state's additional requirements "further[ed] the federal policy" embodied by the federal statute).

### a. H.B. 2048 regulates delivery, not price.

The crux of Novartis's attack on H.B. 2048 is that it "expand[s] the scope of the federal 340B Drug Pricing Program" by giving covered entities the "ability to demand 340B pricing on contract-pharmacy purchases," thus purportedly imposing more onerous conditions than required by federal law. Pl's MPI at 1, 19.

But H.B. 2048 does not expand *federal* requirements. It sets forth Oklahoma's own requirements, with their own consequences. The federal 340B statute dictates what price

---

[17] *See, e.g.*, DRH Health, *supra* note 5.

manufacturers must offer (the "ceiling price") and to whom (340B "covered entities"). H.B. 2048 does not alter either requirement. Rather, H.B. 2048 bars drug companies from discriminating against Oklahoma 340B hospitals based on their chosen delivery location. The *only* thing that H.B. 2048 does is let 340B hospitals within Oklahoma's borders determine the shipping address for drugs they have purchased. In so doing, it simply requires drug companies to allow covered entities to be treated like any other purchaser of those drugs, with the same freedom to select where their drugs will be delivered. *See, e.g.*, *PhRMA v. Fitch*, No. 1:24-cv-160-HSO-BWR, 2024 WL 3277365, at *11 (S.D. Miss. July 1, 2024) ("While federal law comprehensively regulates the determination of ceiling prices on Section 340B drugs . . . , Congress has not precluded Mississippi from enacting its own policy governing delivery of Section 340B drugs.").

Critically, H.B. 2048 does *not* set the price of any drug sales. To borrow from the Eighth Circuit's description of a substantially similar Arkansas statute, "[H.B. 2048] does not set or enforce discount pricing." *PhRMA v. McClain*, 95 F.4th at 1145; *see also PhRMA v. Murrill*, 2024 WL 4361597, at *9 ("[D]iscounts are set by the federal government, not the State of Louisiana or Act 358.").

Nor should the Court be persuaded by Novartis's mischaracterization of the "replenishment model." *See* Pl's MPI at 20–21. The "replenishment model" is an inventory management system that tracks patient and drug data to ensure that 340B hospitals only pay the 340B price for drugs received by their eligible patients. *See, e.g.*, *AbbVie Inc. v.*

*Fitch*, 2024 WL 3503965, at *14 (the replenishment model merely "relies on pharmaceuticals' fungibility to facilitate efficiency").

In the context of contract pharmacies, replenishment works as follows: The contract pharmacy dispenses a drug to a patient from its regular inventory, which has been purchased by the pharmacy at market price. Then, the covered entity or a third-party administrator on behalf of the covered entity identifies the patients who received drugs that are eligible for the 340B discount. Once the pharmacy has dispensed a full package of the drug to patients who have been identified as 340B patients, the 340B Hospital purchases the drugs at the 340B discounted price and ships the drugs to the contract pharmacy that dispensed the drug, replenishing the pharmacy's stock for the drug it dispensed to 340B patients.

Most hospitals use the exact same type of inventory control method in their in-house pharmacies. 340B Providers make an initial purchase of a drug at its full price and add that to their single inventory. Some of the purchased drugs may be used for non-340B patients and some for 340B patients. These drugs, after all, are completely fungible. *See id*. After the pharmacy has dispensed a full package of that drug to 340B patients, it replenishes (or re-stocks) the supply of that drug by purchasing a package of that drug at the 340B-discounted price. Going forward, every time the equivalent of a full package is dispensed to 340B patients it will be replenished at the 340B price.

Thus, replenishment almost always happens whether the 340B drug is delivered to the hospital's pharmacy *or* the hospital's contract pharmacy.

Indeed, by regulating the delivery of 340B drugs, Oklahoma is not adding "a sixteenth type of covered entity to whom manufacturers must 'offer' 340B prices." Pl's MPI at 19. Operating within the precise metes and bounds of the 340B statute—which is silent as to delivery—Oklahoma is protecting its in-state hospitals' flexibility to decide *where* they want drugs that they have purchased to be delivered. As discussed *supra*, when covered entities enter contracts with pharmacies, it is the covered entity—and not the outside pharmacy—that purchases the drugs at the 340B price.

If an Oklahoma hospital wants to buy a particular medication, the drug companies do not contest their obligation to ship that drug to the hospital's in-house pharmacy. H.B. 2048 simply mandates that those companies *also deliver* that drug to the pharmacies with which its in-state hospitals have contracts. Nothing in federal law forbids Oklahoma from making that policy decision.

Novartis also appears to attack the mere fact that H.B. 2048 speaks directly to the federal 340B program and expressly invokes the 340B statute in defining its reach. *See* Compl. ¶ 16 (noting H.B. 2048's definitions of "340B entity" and "340B" drug); *id.* ("It is impossible to explain what H.B. 2048 does without explaining the federal 340B Program first."). But there is nothing improper about a state statute defining its reach by reference to federal law (and then imposing its own requirements)—or even a state statute whose "regulatory object" is a federal program. *See, e.g.*, *Chamber of Com.*, 563 U.S. at 607–08 (rejecting preemption challenge to a state statute under which employers had to check their employees' *federal* immigration status using a specified *federal* database). Nor is it unusual for a state statute to expressly reference a federal program in defining its reach. *See, e.g.*,

63 Okla. Stat. § 2-302(D) (requiring all registered manufacturers and distributors of controlled substances to provide data as required under federal statute, 21 U.S.C. § 827(d)(1)); 51 Okla. Stat. § 24A.5 (State Open Records Act does not apply to personal information in driver records, as defined by the federal Driver's Privacy Protection Act); 25 Okla. Stat. §§ 1312–1313 (requiring employers to check employees' federal immigration status, like in *Chamber of Commerce*).

### b.  H.B. 2048 does not interfere with 340B's remedial regime.

Novartis next contends that H.B. 2048 attempts to "supplement the federal enforcement process with an enforcement scheme all its own." Pl.'s MPI at 23. But contrary to Novartis's assertion, H.B. 2048 does not authorize private citizens, the Department, or Attorney General Drummond to "enforce . . . the federal *340B Program*." *Id.* (emphasis added). Instead, H.B. 2048 strictly provides for the enforcement of *its own* requirements. *See* H.B. 2048 § 5(A)–(B) (setting civil fines for violations of H.B. 2048).

As the Eighth Circuit explained with respect to a similar Arkansas statute:

> Act 1103 ensures that covered entities can utilize contract pharmacies for their distribution needs and authorizes the Arkansas Insurance Division to exact penalties and equitable relief if manufacturers deny 340B drugs to covered entities' contract pharmacies. Ark. Code Ann. § 23-92-604(c). The 340B Program, on the other hand, addresses discount pricing. ***Therefore, HHS has jurisdiction over different disputes***: disputes between covered entities and manufacturers regarding pricing, overcharges, refunds, and diversion of 340B drugs to those who do not qualify for discounted drugs.

*PhRMA v. McClain*, 95 F.4th at 1144 (emphasis added). Because the requirements that can be enforced under H.B. 2048 (like the statute in *PhRMA v. McClain*) are different from the

340B program requirements, it does not conflict with the 340B program's enforcement regime.

Novartis's repeated mention of diversion of drugs to non-eligible patients in this context is also wholly irrelevant to its challenge to H.B. 2048. Pl's MPI at 23–25. The Oklahoma statute regulates the delivery of a 340B drug that has been purchased by a 340B hospital. The question in any state action to enforce H.B. 2048 would be whether the manufacturer refused to deliver a drug purchased by a 340B hospital to a contract pharmacy, not whether that drug was diverted to an ineligible patient. The issue of diversion, which relates to dispensing drugs to a non-340B patient, is completely outside of the scope of the Oklahoma law.[18] And this makes sense because if diversion were an issue, the federal 340B statute requires that HRSA determine whether the 340B drug purchase complied with federal law *after the fact* either through an audit or in the *post hoc* Alternative Dispute Resolution process. 42 U.S.C. §§ 256b(d)(2)(B)(iv) & (3). As such, H.B. 2048 and the federal 340B statute enforce different things and therefore do not raise the possibility of conflicting enforcement decisions.

### B.    H.B. 2048 Is Not an Impermissible Extraterritorial Regulation.

Novartis also claims that H.B. 2048 violates the dormant Commerce Clause, but Novartis's claim is squarely foreclosed by the Supreme Court's decision in *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023), and has been rejected by every court to consider it when evaluating similar efforts to enjoin state contract-pharmacy statutes. *See*

---

[18] For that same reason, it does not matter that H.B. 2048 imposes different penalties than the 340B statute because H.B. 2048 and the 340B statute regulate different conduct.

*PhRMA v. Fitch*, 2024 WL 3277365, at *12–13 (Mississippi); *Novartis v. Bailey*, 2025 WL 595189, at *3–5 (W.D. Mo. Feb. 24, 2025), *appeal filed*, No. 25-1619 (8th Cir.).

Novartis offers no coherent argument that H.B. 2048 violates the "antidiscrimination principle" that "lies at the very core" of the Supreme Court's dormant Commerce Clause cases. *Nat'l Pork Producers Council*, 598 U.S. at 369. That principle is implicated only by state laws that privilege "in-state economic interests" over "out-of-state *competitors*." *Id.* (emphasis added). Because discrimination is the focus, "the objects of disparate treatment [must] be *similarly situated* before a law may be deemed to run afoul of the dormant Commerce Clause." *Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 494 (6th Cir. 2025) (emphasis added).

Although Novartis alleges that "H.B. 2048 [] intentionally discriminates against interstate commerce," it gives away the game by complaining of discrimination between "in-state healthcare providers and pharmacies" (*i.e.*, covered entities) and "out-of-state *manufacturers*." Compl. ¶ 157 (emphasis added). Novartis does not purport to argue, nor could it, that healthcare providers and drug manufacturers are "similarly situated" for purposes of the dormant Commerce Clause. *See also* Pl's MPI at 30–32.

Absent any colorable claim of discrimination, Novartis is left to repeatedly contend that H.B. 2048 "regulate[s] wholly out-of-state transactions between drug manufacturers . . . and out-of-state wholesalers." Compl. ¶ 156. Novartis points again to the replenishment model to suggest that H.B. 2048's protections for 340B covered entities somehow extends to "control" the price of these transactions between manufacturers and wholesalers. Pl's MPI at 27–29. But again, H.B. 2048 does not directly regulate drug

purchases by distributors or wholesalers—it regulates the "acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity," H.B. 2048 § 4(A), and forbids manufacturers from "interfer[ing] with a pharmacy contracted with a 340B entity, *id.* § 4(B). Whatever out-of-state effects Novartis may experience are not the result of H.B. 2048 directly regulating transactions with no connection to Oklahoma.

Like "many (maybe most) state laws," H.B. 2048 may indirectly impact "extraterritorial behavior" for drug companies that are headquartered outside of Oklahoma. *Nat'l Pork Producers*, 598 U.S. at 374. But the statute does not *target* extraterritorial activity or privilege in-state actors over their out-of-state competitors; its prohibitions apply equally to in- and out-of-state sellers of drugs. This Court should reject Novartis's attempt to revive the "extraterritoriality doctrine" so shortly after the Supreme Court rejected it. *See id.* at 371.

Novartis also tries to mislead the Court by arguing that because H.B. 2048's "broad language" is not limited to Oklahoma 340B hospitals, it is an unconstitutional extraterritorial regulation. Pl's MPI at 28. This is unpersuasive for two reasons. *First*, like many states, Oklahoma follows a presumption against extraterritoriality, meaning that "courts will presume that a legislature did not intend to give its enactments impermissible extraterritorial operation." *Cont'l Res., Inc. v. Wolla Oilfield Servs., LLC*, 510 P.3d 175, 181 (Okla. 2022); *accord PhRMA v. Fitch*, 2024 WL 3277365, at *13 (explaining that because an analogous Mississippi law "does not exhibit a clear intent to regulate out-of-state conduct," that statute's "'general words' referring to 340B entities, manufacturers, and pharmacies are prima facie operative only as to persons or things within the territorial

jurisdiction of Mississippi") (internal quotation marks and citation omitted). Novartis's argument would endanger countless Oklahoma statutes that do not recite this background assumption in explicit terms.

*Second*, even if the statute could be construed to reach transactions outside of Oklahoma, Section 6(A) of H.B. 2048 provides that "[n]othing in this act is to be construed or applied to be in conflict with . . . [a]pplicable federal law and related regulations," such that Novartis's reading of the law would be impermissible under Section 6(A).

Finally, Novartis asserts that H.B. 2048 fails the balancing test set out by the Supreme Court in *Pike v. Bruce*, 397 U.S. 137 (1970), which requires that the local benefits of a law be balanced against the burdens placed on out of state entities. In *National Pork Producers*, the Court clarified that it would be an "overstate[ment]" to argue that "*Pike* and its progeny depart from the antidiscrimination rule that lies at the core of our dormant Commerce Clause jurisprudence." 598 U.S. at 377. Moreover, even under the test in *Pike*, the test invalidates a law only if the out of state burden is "clearly excessive in relation to the putative local benefits." *Nat'l Pork Producers*, 598 U.S. at 377 (quoting *Pike*, 397 U.S. at 142). Novartis clearly hasn't proven this to be the case. Novartis ignores the local benefits of H.B. 2048—namely, the benefits to 340B hospitals and their patients, as demonstrated *supra* at pp. 5–8. And the seriousness of this loss is exacerbated by the fact that for decades, hospitals have relied on Novartis and other drug companies which provided the 340B benefits without objection to hospitals that contracted with pharmacies outside the hospital. Given the history of 340B discounts and contract pharmacies, it is difficult to characterize the statute as imposing a burden on Novartis, and any burden

certainly cannot be characterized as "clearly excessive in relation to the putative local benefits."

## II.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST SUPPORT DENYING AN INJUNCTION.

In cases where the government is party, the balance of equities and public interest are considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, where the health of the underserved and vulnerable populations is at risk, these factors heavily weigh against an injunction. Specifically, the balance of equities clearly falls in favor of 340B hospitals, which operate on razor-thin margins, and their patients who may otherwise not have access to healthcare, and not in favor of a drug company that reported $11.9 billion in net income in 2024.[19] Novartis's assertion that patients generally do not gain any benefit from the 340B discount, Pl's MPI at 36, is false and has been completely refuted by a unanimous Supreme Court which noted, "340B hospitals perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n*, 596 U.S. at 738. As discussed above, the 340B program provides many benefits to Oklahoma communities and hospitals. *See supra* at pp. 5–8. For these reasons, the public interest is better served by ensuring that 340B hospitals continue to serve at-risk populations than by further padding the pockets of an already profitable drug company.

---

[19]  *See Novartis Annual Report 2024* at 42, Novartis Global Communications (Jan. 31, 2024),       https://www.novartis.com/sites/novartis_com/files/novartis-annual-report-2024.pdf.

## CONCLUSION

For the foregoing reasons, Novartis's Motion for a Preliminary Injunction should be denied.

Dated: August 25, 2025                    Respectfully submitted,

                                          *s/Daniel G. Webber, Jr.*
                                          Daniel G. Webber, Jr., OBA #16332
                                          Patrick R. Pearce, Jr., OBA #18802
                                          RYAN WHALEY
                                          400 North Walnut Avenue
                                          Oklahoma City, OK 73104
                                          Tel: (405) 239-6040
                                          Fax: (405) 239-6766
                                          dwebber@ryanwhaley.com
                                          rpearce@ryanwhaley.com

                                          William B. Schultz*
                                          Margaret M. Dotzel*
                                          Alyssa M. Howard*
                                          Aaron Chou*
                                          ZUCKERMAN SPAEDER LLP
                                          2100 L Street NW, Suite 400
                                          Washington, DC 20037
                                          Tel: (202) 778-1800
                                          Fax: (202) 822-8106
                                          wschultz@zuckerman.com
                                          mdotzel@zuckerman.com
                                          ahoward@zuckerman.com
                                          achou@zuckerman.com

                                          *Counsel for Amici Curiae*

                                          *\*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2025, I electronically transmitted the attached document to the Clerk of Court using the Electronic Filing System for filing.  Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the ECF System.

*s/Daniel G. Webber, Jr.*
Daniel G. Webber, Jr.